738 F.2d 1352
 238 U.S.App.D.C. 206
 Alvin B. BISCOE, Jr., Eleanor L. Biscoe, His Wife
v.
ARLINGTON COUNTY, Appellant, Arlington County Police
Department, et al.
Alvin B. BISCOE, Jr., Eleanor L. Biscoe, His Wife
v.
ARLINGTON COUNTY, et al.
Michael Kyle, Arlington County Police Department, Appellant.
 Nos. 83-1965, 83-1966.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 16, 1984.
Decided July 6, 1984.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 80-0766).
 William D. Dolan, III, Arlington, Va., with whom William A. Kaplin, Washington, D.C., and Charles G. Flinn, Arlington, Va., were on the brief for appellant, Arlington County, in No. 83-1965.
 Paul F. Sheriden, Fairfax, Va., for appellant, Kyle, in No. 83-1966.
 Joseph H. Koonz, Jr., Washington, D.C., with whom Carolyn McKenney, Roger C. Johnson and Patrick M. Regan, Washington D.C., were on the brief for appellees, Alvin Biscoe, et al. in Nos. 83-1965 and 83-1966. Jill Robinson, and William P. Lightfoot, Washington D.C., also entered appearances for appellees.
 Before TAMM and EDWARDS, Circuit Judges, and HAYNSWORTH,* Senior Circuit Judge, United States Court of Appeals for the Fourth Circuit.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case involves the liability of Arlington County, Virginia, and one of its police officers, for serious injuries to an innocent bystander arising out of a negligent high-speed police pursuit of a suspected bank robber into the District of Columbia. As a result of the negligent pursuit, the plaintiff, Alvin Biscoe, had one of his legs severed and the other severely injured, ultimately requiring amputation. A jury returned a verdict in favor of the injured plaintiff and his wife, and the County and its officer have appealed. We affirm.
 
 I. BACKGROUND
 
 2
 Late in the morning of September 29, 1979, Lyntellus Brooks and Orlando Durantes robbed the Arlington, Virginia branch of the Washington-Lee Savings & Loan Association. Shortly thereafter, an alarm was broadcast to all Arlington County Police Department ("ACPD") units; some of these units went to the robbery scene, and others to probable escape routes in the County. Police radio broadcasts alerted units to look for the persons who had been involved the previous day in a robbery of the Potomac Savings and Loan Association, and informed them that the car used in that robbery was a green Dodge Dart or Plymouth Duster, with a District of Columbia license plate.
 
 
 3
 Officer Michael Kyle responded to the alert by positioning his cruiser eastbound along Route 50. About nine minutes after the initial bank alarm transmission, he spotted a light green car driven by a man who resembled pictures of a suspect from the Potomac bank robbery that Kyle had seen the day before. A woman was seated beside the driver. Kyle radioed his suspicion regarding the driver and began to follow the green car along Route 50, with each car traveling within the speed limit. Kyle followed the car onto the Theodore Roosevelt Bridge (which connects Virginia with the District of Columbia), pulled in behind it, and turned on his overhead lights and siren. The car took the E Street Ramp off the Bridge into the District of Columbia, slowed to a stop in the breakdown lane of the ramp, and came to rest three car lengths in front of the police car. Before the stop, the ACPD dispatcher broadcast that the District of Columbia ("D.C." or "District") and United States Park Police were being notified. Also before the stop, Kyle radioed that the car appeared to have a third passenger--another woman--in the back seat.
 
 
 4
 Once stopped, Brooks, the driver of the car, immediately got out of his vehicle and walked toward Kyle with his hands in the air, leaving his car door open. Kyle got out of his cruiser, with his portable radio in hand, and notified the dispatcher that he had made the stop. Whether the officer also had his revolver drawn at this time was a matter of considerable dispute at trial. Kyle turned Brooks around, walked him back to his car, had him put his hands on the trunk, and ordered him to stay there.
 
 
 5
 According to plaintiffs' evidence, Kyle did not tell Brooks to turn off the car motor, throw his keys to the ground, or shut the car door; he did not instruct him to lie on the ground; and he did not handcuff or frisk him. Instead, the officer turned to the passenger side of the car to look in the back seat, and, with his hand radio, broadcast his location and requested a clothing description of the bank robbery suspects. While Kyle was so preoccupied--leaving Brooks wholly unattended and unrestrained--Brooks ran to his side of the car, jumped in and drove off. Brooks testified that he was able to make a quick escape because he had left the engine running and the car door ajar. Trial Transcript ("Tr.") at 31.
 
 
 6
 Kyle informed his dispatcher of the departure and returned to his car. With his lights flashing and his siren blaring, he pursued Brooks down the E Street Expressway and through the tunnel. Kyle radioed that a fourth passenger in the car was shooting at him, and also that, "I don't know where I'm at." Tr. at 332-33. Brooks, who by now was well within the city limits of the District of Columbia and traveling at more than 70 to 80 m.p.h., drove through a red light at 20th Street and sped toward the 19th and E Street intersection. The speed limit over this distance was 30 m.p.h., until one and a half blocks before the intersection, at which point it dropped to 25 m.p.h. Kyle, who knew neither his speed nor the speed limit, followed. Tr. at 332-33, 338. Plaintiffs contend that the officer averaged 55.38 m.p.h. over this distance and that his speed during the chase increased to 80 m.p.h. Defendants dispute this assertion, but do not deny that Kyle was traveling well in excess of the speed limits.
 
 
 7
 As Brooks approached the intersection, he saw a car traveling south on 19th Street into the intersection. Brooks' car struck that vehicle and careened off into the southeast corner of the intersection, where it pinned a pedestrian, Alvin Biscoe, against a light pole. The impact, which knocked Biscoe in the air, severed one of his legs and severely injured the other, ultimately requiring amputation.
 
 
 8
 Officer Kyle, who had by then arrived on the scene, saw Brooks flee from his car. Kyle removed his shotgun and followed. When Kyle reached Brooks, the suspect had been restrained by pedestrians. Kyle hit Brooks on the right side of his head with the butt of the shotgun. Soon thereafter, other police from various jurisdictions, as well as the United States Park Police helicopter, arrived on the scene.
 
 
 9
 Alvin Biscoe and his wife Eleanor filed a suit for damages against numerous parties, including Officer Kyle, Arlington County, and Brooks. They asserted that from the time Kyle first stopped Brooks' car on the E Street Ramp in the District of Columbia, the officer committed violations of a series of generally accepted police standards--in particular, in his conduct of the felony stop and the high-speed pursuit--which resulted in the accident. Moreover, they claimed that Officer Kyle violated Arlington County regulations that specifically prohibit its officers from engaging in high speed chases--defined as greater than 20 m.p.h. above the speed limit--in the District of Columbia.[1] In addition, they alleged that Arlington County's negligent training and supervision of Officer Kyle were a cause of the accident that injured Alvin Biscoe. After an 11-day trial, a jury returned a verdict finding that defendant Kyle was negligent in his conduct of the felony stop on the bridge and negligent in his high-speed pursuit of Brooks' vehicle, and that his employer, Arlington County, was similarly liable on a theory of respondeat superior. The jury also found that defendant Arlington County was negligent in its training and supervision of Kyle, and that defendant Brooks was negligent as well. The jury additionally found that all defendants' acts and omissions proximately caused the injuries to the plaintiffs. It awarded $4 million to Alvin Biscoe and $1 million to Eleanor Biscoe; the award to Eleanor Biscoe was reduced on remittitur to $350,000.
 
 II. DISCUSSION
 
 10
 Defendants Kyle and Arlington County appeal the judgments against them on a number of grounds, principally involving pure questions of law. We have carefully reviewed each claim and have found none to merit reversal or remand. Accordingly, we affirm.
 
 A. Immunity Issues
 1. Sovereign Immunity
 
 11
 Initially, defendant Arlington County asserts that the District Court improperly declined to recognize the immunity from tort claims that the County retains under Virginia law. In support of this assertion, Arlington County argues that the United States Constitution's Full Faith and Credit Clause, U.S. CONST. art. IV, Sec. 1, compels application of Virginia immunity in this case, that principles of comity require that Virginia's immunity be recognized in the District, and that the District's choice of law rules require adoption of that aspect of Virginia law.
 
 
 12
 The first of these arguments may be readily dismissed on the basis of the Supreme Court's decision in Nevada v. Hall, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), which held that federal constitutional law does not prohibit one state's courts from entering a judgment against or asserting jurisdiction over another sovereign state. In Hall, plaintiffs sued Nevada in a California court for injuries suffered in a traffic accident allegedly caused by a Nevada state employee driving in California. Nevada had argued that under the Constitution it was immune from suit in courts of another state, but the California Supreme Court decided that the issue of Nevada's immunity from suit in California was controlled solely by California law, and that California would not extend immunity to Nevada as a matter of comity. Hall v. University of Nevada, 8 Cal.3d 522, 503 P.2d 1363, 105 Cal.Rptr. 355 (1972) (en banc), cert. denied, 414 U.S. 820, 94 S.Ct. 114, 38 L.Ed.2d 52 (1973). After a remand and trial, the United States Supreme Court affirmed the California court's judgment against Nevada, broadly holding that nothing in the federal Constitution requires a state to accord immunity to another, and therefore that the Constitution imposes no special limits on states' power to authorize their courts to assert jurisdiction over another state.[2] It rejected arguments both that the Constitution implicitly gives states immunity in courts of other states, and that the Full Faith and Credit Clause requires a forum state to resort to the law of the defendant state to determine its amenability to suit. Justice Stevens responded to Nevada's Full Faith and Credit Clause claim with the explanation that the clause does not require a state to apply the law of another state in violation of its own legitimate public policy. Nevada v. Hall, 440 U.S. at 422, 99 S.Ct. at 1189. Finally, the Court made clear, a forum state might defer to a sister state's retained immunity, even though it need not do so.
 
 
 13
 To determine whether the Full Faith and Credit Clause requires that the District apply Virginia's law regarding the immunity of its counties, we must ascertain the District's policies and determine whether they would be violated by application of Virginia law. See Nevada v. Hall, 440 U.S. at 422, 99 S.Ct. at 1189. ("[T]he Full Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy."); Mianecki v. Second Judicial District Court, 658 P.2d 422, 424 (Nev.1983) (holding that clause does not require recognition of Wisconsin's immunity rules when they conflict with Nevada's policies), cert. dismissed, --- U.S. ----, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Under Virginia law, counties are fully immune from suit in tort, at least in Virginia courts. Mann v. County Board, 199 Va. 169, 98 S.E.2d 515 (1957); Fry v. County of Albemarle, 86 Va. 195, 9 S.E. 1004 (1889). Under District of Columbia law, the District enjoys immunity from suit only if the actions in question are committed in the exercise of a "discretionary" function. Wade v. District of Columbia, 310 A.2d 857, 860 (D.C.1973) (en banc). Since the plaintiffs' claims against the appellant County are based on its negligent performance only of nondiscretionary acts,[3] had those acts been committed by the District of Columbia Metropolitan Police Department, sovereign immunity would not bar suit against the District. Forced application of Virginia's law would therefore frustrate the policies that underlie the District's immunity rules; under Nevada v. Hall, the District is not required to honor Virginia's claim of sovereign immunity under such circumstances. See Mianecki, 658 P.2d at 424 (applying Nevada v. Hall in this way); Struebin v. State, 322 N.W.2d 84, 85-86 (Iowa) (same), cert. denied, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 933 (1982). We need not decide, as the Supreme Court did not, whether the clause requires application of a sister state's immunity rules when they are not in conflict with policies of the forum state.
 
 
 14
 The potential sweep of the Supreme Court's holding--which, as Justice Blackmun pointed out in dissent, Nevada v. Hall, 440 U.S. at 428-29, 99 S.Ct. at 1192-93 (Blackmun, J., dissenting), could be read to authorize suit in a foreign forum against a state for acts committed within its own territory--led the Court to assure, in a footnote, that
 
 
 15
 California's exercise of jurisdiction in this case poses no substantial threat to our constitutional system of cooperative federalism. Suits involving traffic accidents occurring outside of Nevada could hardly interfere with Nevada's capacity to fulfill its own sovereign responsibilities. We have no occasion, in this case, to consider whether different state policies, either of California or of Nevada, might require a different analysis or a different result.
 
 
 16
 440 U.S. at 424 n. 24, 99 S.Ct. at 1190 n. 24. Arlington County urges this footnote upon us as support for its position that under the facts of this case, the Full Faith and Credit Clause requires the application of Virginia's immunity rules. Overlooking the considerable and significant similarities between the District's interest in this case and that of California in Nevada v. Hall--in both cases, the forum state is the site of a traffic accident involving an employee of a foreign jurisdiction--Arlington County maintains that the District's failure to apply Virginia's immunity rules in this case undermines the County's capacity to fulfill its law enforcement responsibilities.
 
 
 17
 We find the County's position to be seriously flawed. First, the cited footnote points out that the facts of Nevada v. Hall did not threaten Nevada's sovereign responsibilities, but does not in any respect limit the holding to the facts of that case. Nor does the footnote suggest that an exception must ever be made to the principles articulated in the opinion. Second, to the extent that the footnote was meant to carve out an exception to the broad principle that the opinion establishes--to wit, that the Constitution does not mandate interstate comity--we have no doubt that this is not the kind of exceptional case the footnote was meant to address. For one, Arlington County itself expressly recognizes that its law enforcement interests weaken--and will yield to other interests--when it acts outside Virginia's borders. The County's prohibition on high-speed police chases in Maryland and the District of Columbia makes this recognition pristinely clear. See note 1, supra. Also, the situation in this case, in which a Virginia county acted outside Virginia territory, obviously is wholly different from one in which a Virginia county has acted within its borders, or those of the state, and is sued in the courts of a sister state. The activity at issue here represents an extremely narrow slice of the County's law enforcement endeavors and, most importantly, unlike much else that the County police do, this activity also directly implicates the sovereignty of another entity. The result is that the threat to the County's sovereignty is considerably less, and the threat to another entity's sovereignty is considerably greater than in the scenario just described, where a state has acted only within its borders. In sum, application of Virginia's policy of immunity would clearly frustrate District policies in favor of deterrence and compensation, and the facts of this case warrant no further inquiry into the meaning of the quoted footnote. See Struebin v. State, 322 N.W.2d at 86 (considering Nevada v. Hall footnote, concluding that Illinois is not immune from suit in Iowa for alleged failure to maintain bridge); see also Peterson v. Texas, 635 P.2d 241 (Colo.Ct.App.1981) (Texas not immune from Colorado suit based on alleged tort of youth participating in Colorado in a Texas juvenile rehabilitation program); Wendt v. County of Osceola, 289 N.W.2d 67 (Minn.1979) (Iowa county not immune from suit in Minnesota for alleged failure to post adequate road signs). Accordingly, we hold that the federal Constitution does not require recognition of Virginia's immunity rules in this case, and that resolution of the issue is left, as in Nevada v. Hall, to state law.
 
 
 18
 We turn then to the County's second argument--that it is immune from suit in the District under principles of comity. Nevada v. Hall left open the possibility that a state might, as a matter of comity, recognize another state's immunity. The District of Columbia Court of Appeals, sitting en banc, has expressly declined to do so, however, and, as a court with diversity jurisdiction, we are bound to that determination. In Qasim v. Washington Metropolitan Area Transit Authority, 455 A.2d 904, 906 (D.C.) (en banc), cert. denied, --- U.S. ----, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983), the court of appeals considered and rejected an argument that WMATA, as an agency of each sovereign signatory to the interstate compact that created it, is clothed with the sovereign immunity granted by the Eleventh Amendment to its parent states. Without deciding whether WMATA would, in a proper case, be protected by the Eleventh Amendment, the court wrote,
 
 
 19
 [T]he doctrine does not bestow immunity in another sovereign's courts. Such a claim necessarily implicates the power and authority of a second sovereign. Immunity in the courts of another sovereign "must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity." Nevada v. Hall, 440 U.S. 410, 416, 99 S.Ct. 1182, 1186, 59 L.Ed.2d 416 (1979). The WMATA Compact contains no agreement, express or implied, granting immunity to a signatory from suits involving WMATA brought in the courts of the other two signatories. Thus Maryland and Virginia do not have sovereign immunity from suits brought in the District of Columbia courts.
 
 
 20
 455 A.2d at 906 (emphasis added). We could scarcely imagine a more straightforward statement that the District of Columbia courts, whose rules on comity we must follow in a diversity action, will decline to recognize the sovereign immunity of Virginia or its counties. See also Daughtry v. Arlington County, 490 F.Supp. 307, 312-13 (D.D.C.1980) (declining to recognize the County's immunity claim). We therefore decline to do so. Against this background, we simply have no reason to believe that the District of Columbia courts would give effect to Virginia's law out of deference or respect, when that law is contrary to the policies of the District. See Mianecki, 658 P.2d at 425 (declining, as a matter of comity, to adopt policy of Wisconsin that is contrary to policy of Nevada).
 
 
 21
 Finally, the County argues, proper application of the District's choice of law principles requires application of Virginia's rules on the immunity of its counties. The District of Columbia Court of Appeals' treatment of immunity in Qasim leaves us uncertain whether choice of law principles are even applicable in this context, or whether our inquiry under D.C. law properly ends after resolution of the comity issue. The Qasim court did not identify District of Columbia and Virginia laws on the immunity of agents of the sovereign; it simply concluded that it need not, and would not, import any immunity Virginia might retain in its own courts for its agents.
 
 
 22
 We also note that state courts faced with claims of immunity either by sister states, or by their lesser governmental units, have resolved the issue by reference to the forum state's policy on comity, not by rigid application of choice of law rules. See, e.g., Mianecki v. Second Judicial District Court, 658 P.2d 422 (Nev.), cert. dismissed, --- U.S. ----, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); Struebin v. State, 322 N.W.2d 84 (Iowa), cert. denied, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 933 (1982); Peterson v. Texas, 635 P.2d 241 (Colo.Ct.App.1981); Ehrlich-Bober & Co. v. University of Houston, 49 N.Y.2d 574, 404 N.E.2d 726, 427 N.Y.S.2d 604 (1980). The rationale for this approach is not entirely clear. One explanation might be that each state's immunity law is perceived as addressing only its immunity in its own courts, and therefore is not susceptible to application in the courts of another state. This explanation would be consistent with the view, espoused by the California Supreme Court in Hall v. University of Nevada, 8 Cal.3d 522, 105 Cal.Rptr. 355, 503 P.2d 1363 (1972) (en banc), cert. denied, 414 U.S. 820, 94 S.Ct. 114, 38 L.Ed.2d 52 (1973), that the sovereignty of one state does not extend into that of another state, so as to create immunity from suit there, but instead ends at the state boundary. Another possible source of the state courts' analytical framework is the proposition that once a state court concludes that another state's immunity rule conflicts with its own, and will not apply as a matter of comity, the outcome of the state's choice of law analysis is inevitable.[4] It is also possible that defendant states have waived immunity at home, albeit not in sister states, and, therefore, their laws on immunity are not truly in conflict with those of the sister states. Finally, it is conceivable that the state courts view immunity as a threshold issue, to be resolved along with certain procedural and jurisdictional matters, solely by reference to forum state rules.
 
 
 23
 The District of Columbia courts have not expressly considered whether choice of law principles are relevant, as a matter of D.C. law, to the decision whether to recognize a sister state's immunity rules; the parties have not raised this issue at all but instead simply have assumed that choice of law analysis applies. Nor must we resolve the question here, because we have no doubt that under the District's choice of law rules, District of Columbia law applies on this issue. Accordingly, in the belief that the question is one that the District of Columbia Court of Appeals should properly resolve in the first instance, we will simply assume arguendo that the local court would resolve this issue by reference to its choice of law rules.
 
 
 24
 The District of Columbia adopts the governmental interest analysis approach to resolve choice of law questions. Williams v. Williams, 390 A.2d 4, 5 (D.C.1978). This approach requires a court "to evaluate the governmental policies underlying the applicable conflicting laws and to determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." Id. at 5-6 (footnote omitted). When the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails.[5] Where each state would have an interest in application of its own law to the facts, a true conflict exists and the law of the jurisdiction with the stronger interest will apply. See, e.g., Mazza v. Mazza, 475 F.2d 385, 392 (D.C.Cir.1973) (applying the law of the jurisdiction whose interest, on balance, was more significant).
 
 
 25
 There can be no doubt that this case presents a true conflict, and that the District Court properly resolved that conflict in favor of the law of the District. As a general matter, the immunity of Virginia's counties primarily reflects the state's concern for the financial integrity of its counties--a concern which, we have little doubt, can amply be met with the purchase of liability insurance. Immunity no doubt also reflects the state's concern that the prospect of liability will deter police officers from proper performance of their duties. These concerns generally might give Virginia a strong interest in its counties' continued immunity. However, that interest is considerably weakened when viewed in light of both the facts of this case and Virginia's official and governmental immunity scheme. First, Virginia's police officers are not immune from liability in this context, and their personal amenability to suit no doubt accomplishes at least some of the deterrence that it is feared would result were the County liable as well. See Gregoire v. Biddle, 177 F.2d 579 (2d Cir.1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). Second, under District law the County is liable only for negligent performance of nondiscretionary acts, which by definition leave to the Government actor little choice on procedure; the only actions deterred would be violations of a state's orders to its employees. Third, much as the prospect of liability might thwart discretionary decision-making, it may also deter misconduct, particularly in a nondiscretionary context. Fourth, the state of Virginia recently has waived its immunity from suit in tort in certain cases, although limiting the amount recoverable. See Virginia Tort Claims Act, VA.CODE Sec. 8.01-195.1 et seq. (1983 Supp.). This enactment, although not applicable to the counties, displays Virginia's awareness of the modern trend away from, and the absence of a need for sovereign immunity. See Taylor, A Re-Examination of Sovereign Tort Immunity in Virginia, 15 U.RICH.L.REV. 247 (1981). Thus, in the context we confront, the concern for deterrence is weak, if existent, and we are only left with Virginia's concern for the economic well-being of its counties. This concern, limited to the rare tort suit arising out of acts outside Virginia, simply is not an especially compelling one, particularly given the availability of liability insurance.
 
 
 26
 In contrast, the District's interest is plainly significant. Generally, a governmental entity's waiver of immunity signifies its dual interests in deterrence of potential tortfeasors and compensation of injured parties. Given the facts of this case, the former is strongly implicated, and the latter less so. First, as the site of most of the relevant conduct and all the injury, the District has a strong interest in deterring conduct of this kind. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS Sec. 146 comment d (1971) (When conduct and injury occur in the same state, that state usually will be the state of dominant interest, since the two principal elements of the tort, conduct and injury, occurred within its territory. "The state where the defendant's conduct occurs has the dominant interest in regulating it and in determining whether it is tortious in character. Similarly, [it] will, usually at least, have the dominant interest in determining whether the interest affected is entitled to legal protection."). The defendants' acts "created the precise danger to District life and property"[6] that various District and Arlington County regulations sought to prevent, and liability would discourage such acts. Moreover, while a compensatory policy "has the greatest relevance to cases when the mishap occurs in the District and when District residents are plaintiffs," Gaither v. Myers, 404 F.2d 216, 223 (D.C.Cir.1968), this court has previously recognized the special and largely unique interest of the District in protecting persons who live in the surrounding suburbs and work in the District. As we have observed,
 
 
 27
 [T]o confine the benefits of the ... rule to the territory ceded by the states of Maryland and Virginia to form the Nation's Capital would be to shun the present reality of the economically and socially integrated greater metropolitan area. It is commonplace that residents of Maryland are part of the Washington Metropolitan trading area, and that District residents and businesses have an interest in the well-being of these citizens of the Free State.
 
 
 28
 Id. at 223. In other words, when a plaintiff such as Dr. Biscoe, who is a Maryland resident working in the District, is injured in the District, District of Columbia courts have recognized a strong local interest in protecting that plaintiff. See also RESTATEMENT (SECOND) OF CONFLICT OF LAWS Sec. 146 comment e (1971) ("The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there.").
 
 
 29
 Nor does the foregoing complete our review of interests the District has in application of its liability rules. In Qasim, the District evidenced an unwillingness to embrace Virginia's sovereign immunity rules; thus, to the extent they have spoken, District of Columbia courts have established a local policy against application of this key aspect of Virginia law. The court's rulings on Virginia's immunity in that case, if not dispositive, are surely entitled to great weight. This is especially so when we look to Virginia choice of law rules to ascertain the interest of Virginia in application of its law to the facts of this case. See Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense, 350 F.2d 468, 473-75 (D.C.Cir.1965) (looking to choice of law rules of Maryland, an interested state, to determine which state's substantive law it would apply), cert. denied, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). Under Virginia law, the law of the site of the wrong applies. McMillan v. McMillan, 219 Va. 1127, 253 S.E.2d 662 (1979) (reaffirming Virginia's adherence to the rule of lex loci delicti--the law of the state where the tort occurs governs the substantive elements of the cause of action). Thus, to the extent that choice of law principles properly determine questions of immunity, Virginia would either apply the District's rules or have to fashion an exception based on its own policies. On balance, we conclude, the District's policies would be substantially more seriously thwarted by nonapplication of its law in this context than would those of Virginia, and we affirm the District Court's choice of law ruling.
 
 2. Official Immunity
 
 30
 In an argument adopted by Officer Kyle, the County argues that Officer Kyle is immune from liability in tort for his conduct. Despite its vehement argument that Virginia immunity rules control the issue of the County's immunity, the County is absolutely silent on the application of Virginia law to the question of an officer's immunity from suit. Nor is this surprising. Under Virginia law, employees of the state may be held liable for negligent conduct. See Elder v. Holland, 208 Va. 15, 155 S.E.2d 369 (1967) (state employee liable); Wynn v. Gandy, 170 Va. 590, 197 S.E. 527 (1938) (county employee liable); see also James v. Jane, 221 Va. 43, 267 S.E.2d 108 (1980) (recognizing that in some contexts state employees may be immune from suit in negligence) (rereported at 282 S.E.2d 864 (1980)). Under District of Columbia law, municipal employees are immune only for tortious conduct in the performance of discretionary functions. See, e.g., Rieser v. District of Columbia, 563 F.2d 462, 475 (D.C.Cir.), vacated, 563 F.2d at 482 (D.C.Cir.1977) (en banc), majority opinion reinstated in relevant respects, 580 F.2d 647, 658 (D.C.Cir.1978) (en banc). Thus, on this issue, defendants are content not to challenge the District Court's application of District of Columbia law. Instead, the defendant County asserts that Officer Kyle's acts were discretionary, and that he therefore is immune under the District's law. It similarly claims that the acts of which it is accused independently were discretionary, and that it is immune if District of Columbia law applies.
 
 
 31
 We believe the actions at issue were clearly ministerial and operational, as those terms are defined by the District courts, and that neither Officer Kyle nor the County was immune from suit under local law. District Court Judge Harold Greene ruled against the County on this issue before permitting the case to go to trial, and we agree with his determination.
 
 
 32
 In the District of Columbia, both official and governmental immunity depend on the ministerial-discretionary dichotomy. The term ministerial "connotes the execution of policy as distinct from its formulation." Elgin v. District of Columbia, 337 F.2d 152, 154-55 (D.C.Cir.1964). In contrast, "If policy considerations were involved and no statutory or regulatory requirements limited the exercise of policy discretion, ... immunity would bar suit." Chandler v. District of Columbia, 404 A.2d 964, 966 (D.C.1979). In other words,there are certain decisions made in the exercise of the discretionary functions of government for which there is no reason to believe a jury would render a sounder decision than those officials chosen, qualified, and prepared to make them. It is these that are labeled "discretionary" and which constitute policy decisions deemed immune from suit because there is no legal standard by which a judge or jury could gauge their arbitrariness and capriciousness or lack thereof.
 
 
 33
 Id.
 
 
 34
 Under existing precedent in this Circuit, we have no doubt that the activities at issue here--supervising and instructing officers, conducting a felony stop, and conducting a felony pursuit--are ministerial, not discretionary, acts. They involve day-to-day operational matters, not planning and policy. Thus, addressing the first of these activities, supervision and instruction, it has been aptly noted that,
 
 
 35
 From the very nature of these activities, it is clear that they do not involve the kind of policy-formulating, judgment-making processes encompassed by the term "discretionary." Once the decisions have been made to have a police department, to organize it in a particular way, and to hire a specific individual to be a member of that department, the acts of training, instructing, supervising and controlling the individual officer are merely "ministerial."
 
 
 36
 Thomas v. Johnson, 295 F.Supp. 1025, 1031 (D.D.C.1968); cf. Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961) (en banc).[7] Similarly, regardless whether the initial decision of a police officer to stop or pursue a car is ministerial or discretionary, a police officer's execution of such activities is ministerial. See Mason v. Bitton, 85 Wash.2d 321, 534 P.2d 1360, 1365 (1975) (en banc). This is especially so where, as here, the officer is constrained both by regulations and clearly established policy and standards, about which experts can, and have testified. The judgment that limits must be imposed--as for example, on the speed of a vehicle in hot pursuit--indicates that the ACPD already had made the decision to limit the officer's exercise of discretion; imposition of such limits also suggests that effective law enforcement would not be hindered by enforced adherence to such regulations. Similarly, established procedures for the conduct of a felony stop, once the stop has been made, curtail an officer's need or opportunity to make policy decisions on the scene. We therefore need not be concerned that tort liability for such operational actions would "pose threats to the quality and efficiency of government." Spencer v. General Hospital, 425 F.2d 479, 482 (D.C.Cir.1969) (en banc); see Carter v. Carlson, 447 F.2d 358, 362-63 & nn. 8-9 (D.C.Cir.1971) (no immunity from suit for tort committed in course of making an arrest), rev'd in part on other grounds, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); Wade v. District of Columbia, 310 A.2d 857 (D.C.1973) (en banc). Accordingly, we conclude that the particular acts of which plaintiffs complain are ministerial, and that both Officer Kyle and the County were properly found to be liable for damages.
 
 B. Standard of Care
 
 37
 The record and briefs in this case reflect an extraordinary degree of confusion surrounding the proper standard of care to be applied to the felony stop and pursuit. We conclude that the proper standard for the District of Columbia is that of due care, as limited by the guidelines applicable to Officer Kyle's conduct. See Mason v. Bitton, 85 Wash.2d 321, 534 P.2d 1360 (1975) (en banc) (under statute with same language as D.C. regulations, police and other officers have duty to act with due regard for the safety of all persons and property while operating emergency vehicles); Myers v. Town of Harrison, 438 F.2d 293 (2d Cir.) (same), cert. denied, 404 U.S. 828, 92 S.Ct. 64, 30 L.Ed.2d 57 (1971). We also conclude that whatever challenge is now raised is waived for failure to preserve it below.
 
 
 38
 Defendants assert that the proper standard of care to which they should be held is gross negligence. The basis for this argument is a provision of the D.C.Code that expressly waives the immunity of the District for the negligent operation of District-owned vehicles by District employees, except for claims "arising out of the operation of an emergency vehicle on an emergency run," D.C. CODE ANN. Sec. 1-1212 (1981), for which the District is liable only for gross negligence.[8] The Code defines "emergency run" to refer to the movement of District-owned vehicles and "employee" to mean an officer or employee of the District. D.C. CODE ANN. Sec. 1-1211(4), (6) (1981). Against this clear legislative statement of an intent to limit the applicability of the gross negligence standard to District liability for damages caused by District vehicles, we would be hard put to accept defendants' argument that the standard applies to them. This is especially true given the natural concerns--proved accurate in this case--that District emergency vehicles have both a greater responsibility and a greater ability to respond to emergencies in the District, and particularly in crowded metropolitan areas at lunchtime, than do non-District vehicles. Moreover, the gross negligence standard of D.C.Code Ann. Sec. 1-1212 obviously does not protect employees, as opposed to the municipality, and surely does not cover Officer Kyle.
 
 
 39
 That a statute expressly limited to employer liability for damages caused by District vehicles is not intended to apply to non-District vehicles is made particularly apparent by the existence of another regulation explicitly applicable to drivers of both District and non-District vehicles. Under this second provision, Officer Kyle, as the driver of an authorized emergency vehicle, was bound to exercise "due regard for the safety of all persons," 18 D.C.M.R. Sec. 2002.4 (1981) (previously found at 17 D.C.R.R. Sec. 6), and was not protected from the consequences of his reckless disregard for the safety of others. Id. The municipal regulations define an authorized emergency vehicle as the vehicle of any police department, 18 D.C.M.R. Sec. 9901, presumably including that of Arlington County; under District law the regulation therefore applies to Kyle and imposes on him a duty to act with due care for the safety of others while driving an emergency vehicle in the District. See also Tetro v. Town of Stratford, 189 Conn. 601, 458 A.2d 5 (1983) (liability permissible on a finding of negligence, based on language similar to that in the District regulation); Mason v. Bitton, 85 Wash.2d 321, 534 P.2d 1360 (1975) (en banc) (statute with language like that in the District regulation imposes actionable duty to exercise due care during felony pursuit); Myers v. Town of Harrison, 438 F.2d 293 (2d Cir.1971) (same). See generally Annot., 4 A.L.R. 4th 865 (1981) (citing numerous cases on state, county and municipal liability for injury to innocent persons as a result of police chases).
 
 
 40
 Apart from our finding that the proper standard is that of due care, we also find that defendants have waived whatever challenge they might have had to the instruction on standard of care. They did not offer an instruction below that was refused, did not state grounds for any objection they might have had to the instruction given, and did not clearly object. See FED.R.CIV.P. 51. In his memorandum and order denying defendants' motion for judgment notwithstanding the verdict, Judge Greene wrote,
 
 
 41
 It may be noted, too, that defendants submitted only the sketchiest of instructions on this as on other issues (Tr.1775); they did not renew their request on this issue after the Court apprised the parties on how it would instruct (Tr. 1789-1800); nor did they renew the objection after the Court completed its charge (Tr. 1885-86).
 
 
 42
 Biscoe v. Arlington County, No. 80-0766, Mem.Op. at 3 n. 2 (D.D.C. Aug. 5, 1983), reprinted in Joint Appendix ("J.A.") 87, 89.
 
 
 43
 In its Reply Brief, Arlington County nonetheless asserts that it did challenge the instruction. The trial record and transcript suggest otherwise. First, the County neither produces nor points to any proferred instruction containing the gross negligence standard. Second, in the one instance when the County's attorney suggested that the proper standard might be gross negligence, the court responded,
 
 
 44
 I must say in all candor nobody really submitted any instructions about this case, so we have worked up some instructions which are being typed now and which I have to look over some more and will take a while to get them in final form and I will distribute them to the parties and I think some of the questions we are talking about now are simply in the abstract and you can talk more appropriately in the concrete when my proposed instructions are completely finalized. That will take about 45 minutes to an hour, so we will at least have some instructions we can talk about rather than just saying well, this is appropriate and that is not, and so forth, so that is what I propose to do.
 
 
 45
 Tr. at 1775-76. Thereafter, counsel for the defendants raised numerous issues, but did not challenge the instructions setting forth a negligence standard. Rule 51 states with unmistakable clarity that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The County has not demonstrated that it objected at any stage to the instruction offered by Judge Greene, and surely never did so with any explanation. We therefore decline to consider the argument on appeal, particularly in the absence of plain error. See Hobson v. Wilson, 737 F.2d 1 at 31-32 (D.C.Cir.1984) (declining to address challenge to jury instruction when objection was not properly preserved at trial).
 
 C. Existence of a Cause of Action
 
 46
 Defendants contend that District of Columbia courts do not recognize the causes of action on which the Biscoes based their action. However, the cases on which defendants rely for this argument are plainly inapplicable; accordingly, we reject their contention as being wholly without merit.
 
 
 47
 Initially, there is no question that the District recognizes a cause of action for negligent training and supervision of police officers. This court has expressly so held. Marusa v. District of Columbia, 484 F.2d 828, 830-31 (D.C.Cir.1973); Carter v. Carlson, 447 F.2d at 368.
 
 
 48
 Nor should there be any question that a police officer's improper conduct of a felony stop and pursuit may give rise to a suit in damages.[9] Defendants nevertheless rely on cases establishing the general proposition that no cause of action exists against police officers who fail to prevent crime, see, e.g., Morgan v. District of Columbia, 468 A.2d 1306 (D.C.1983) (en banc), to argue that no cause of action exists here. However, Morgan expressly distinguished cases of the kind we confront, in which a police officer, having exercised discretion and chosen to act, fails to act reasonably, see id. at 1313, thereby proximately causing injury to another. Cases such as Morgan involve a failure to assist when assistance might prevent or cut short ongoing criminal activity; they do not involve a situation like the one here, in which police activity, affirmatively undertaken and negligently handled, directly contributes to creation of a dangerous situation.[10] In the former instance, courts have found that police officers have no individualized duty to prevent crime, and that failure to do so is not actionable. The situation we confront is of a different kind altogether, involving officers with a duty to exercise due care for the safety of innocent persons, and is not controlled by Morgan.[11] This point is amply highlighted by the fact that numerous jurisdictions have recognized a cause of action for negligent conduct of a high-speed chase, where the pursued vehicle strikes and injures an innocent third party. See, e.g., Fiser v. City of Ann Arbor, 417 Mich. 461, 339 N.W.2d 413 (1983); Tetro v. Town of Stratford, 189 Conn. 601, 458 A.2d 5 (1983); City of Sacramento v. Superior Court, 131 Cal.App.3d 395, 182 Cal.Rptr. 443 (1982); Selkowitz v. County of Nassau, 45 N.Y.2d 97, 408 N.Y.S.2d 10, 379 N.E.2d 1140 (1978); Reed v. Winter Park, 253 So.2d 475 (Fla.App.1971); Myers v. Town of Harrison, 438 F.2d 293 (2d Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 64, 30 L.Ed.2d 57 (1971); Mason v. Bitton, 85 Wash.2d 321, 534 P.2d 1360 (1975) (en banc); Schatz v. Cutler, 395 F.Supp. 271 (D.Vt.1975). See generally Annot., 4 A.L.R. 4th 865 (1981) (citing numerous cases on government liability for injury to innocent persons as a result of a police chase).
 
 D. Remaining Issues
 
 49
 Defendants raise several other issues, which were not pressed at oral argument, and we find no merit to them.[12] In short, having reviewed the entire record in this case with great care, we find that the jury's verdict was fully justified by the evidence. Furthermore, we can find no basis to overturn any of the challenged evidentiary or legal rulings of Judge Greene.
 
 CONCLUSION
 
 50
 For the foregoing reasons, we affirm the court's judgment.
 
 
 51
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 Arlington County Police Department, Departmental Directive No. 74-4, provides in relevant part:
 I. PURPOSE: The purpose of this directive is to announce Departmental policy and describe procedures for "hot pursuit" of violators of the criminal and traffic laws of the Commonwealth and the County.
 II. POLICIES:
 A. Pursuit in Arlington County
 
 
 [1]
 It is the policy of this Department that pursuit at high speeds is justified only in those instances where the officer has personal knowledge or reasonable cause to believe that the person being pursued has committed or attempted to commit a felonious act which resulted in or could have resulted in death or serious bodily injury
 
 
 [2]
 Pursuit at lesser speeds is permitted, where necessary, to apprehend other felons, misdemeanants, and traffic violators. High speed pursuit of such violators in an area as geographically compact and heavily populated as Arlington County would be potentially more hazardous than permitting the violator to escape apprehension
 
 
 [3]
 High speeds are defined for the purpose of this directive as speeds more than 20 miles per hour in excess of posted speed limits. This definition is in the nature of a guideline and must be interpreted in light of road conditions, weather, time of day, density and flow of traffic, and the nature of the surrounding area. The decision to initiate, continue and terminate pursuit must be at the discretion of the officer after due consideration of the seriousness of the offense, possible consequences and safety of all concerned. Where a pursuit has occurred, the absence of evidence to the contrary will be presumptive evidence that the officer was in compliance with Departmental orders, rules and regulations
 B. Pursuit Elsewhere in Virginia
 ....
 C. Pursuit in the District of Columbia
 
 
 [1]
 Under no circumstances will an officer pursue a misdemeanant or traffic offender into the District of Columbia. An officer from this Department has no authority to arrest in the District for a misdemeanor or traffic violation and may not request the assistance of a District officer in making such an arrest
 
 
 [2]
 When pursuing a known felon or a person whom the officer has reasonable cause to believe has committed a felony, and the pursuit appears likely to enter the District of Columbia, all possible means will be utilized to notify the District police of such fact and to describe in detail the vehicle and, where possible, the occupants. High speed pursuit in the District is prohibited. Pursuit at reduced speeds is permissible until the vehicle can be stopped or until District officers join the pursuit. At such time as District officers begin pursuit, the Arlington unit will discontinue direct pursuit and proceed, without emergency equipment, in the direction of the pursuit or to the scene of the apprehension as directed by the dispatcher
 
 
 [3]
 Only the immediately pursuing officer will enter the District of Columbia unless other units are dispatched to assist an officer in trouble
 
 
 [4]
 An arrest for a felony committed in Virginia may be made in the District by an Arlington officer. Under no circumstances, however, will such person be returned to Arlington without being processed through the District of Columbia judicial system
 D. Pursuit into Maryland
 Pursuit into Maryland will be governed by the foregoing rules for the District of Columbia.
 
 
 [2]
 Nevada v. Hall was initially a state court action and therefore did not implicate the Eleventh Amendment, which by its terms applies only to federal courts. Similarly, because the case we consider involves a suit against a county, the Eleventh Amendment is not implicated. See P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 690 (2d ed. 1973) ("A suit against a county, a municipality, or other lesser governmental unit is not regarded as a suit against a state within the meaning of the Eleventh Amendment.") (citing Cowles v. Mercer County, 74 U.S. (7 Wall.) 118, 19 L.Ed. 86 (1869); Markham v. City of Newport News, 292 F.2d 711 (4th Cir.1961)). No party suggests otherwise
 
 
 [3]
 See section II(A)(2), infra
 
 
 [4]
 Of course, under the lex loci delicti choice of law rule directing courts to apply the law of the site of the wrong, this result is not inevitable. Indeed, that scenario counsels against application of choice of law principles to resolve the immunity issue. Virginia follows lex loci delicti principles in determining which law to apply. See McMillan v. McMillan, 219 Va. 1127, 253 S.E.2d 662 (1979). Yet, had this case been brought in Virginia state court, we would not expect that Virginia would apply District rules on immunity to the County to determine its suability, but instead would treat the issue as a threshold one of amenability to suit controlled by Virginia law
 
 
 [5]
 See Milhollin, The New Law of Choice of Law in the District of Columbia, 24 CATH.U.L.REV. 448, 450 (1975)
 
 
 [6]
 Milhollin, note 5, supra, at 454
 
 
 [7]
 Of course, not all actions having to do with training police officers are necessarily operational or ministerial, see Carter v. Carlson, 447 F.2d 358, 363-64 (D.C.Cir.1971) (training and supervision have both ministerial and discretionary components), rev'd in part on other grounds, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), but we have no reason to believe, as Judge Greene did not, that plaintiffs' allegations concern anything but the operational aspects of such activity
 
 
 [8]
 D.C. CODE ANN. Sec. 1-1212 (1981) provides in relevant part:
 Hereafter the District of Columbia shall not assert the defense of governmental immunity in any suit at law in which a claim is asserted against it for money only on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the District occurring as the result of the operation by such employee, within the scope of his office or employment, of a vehicle owned or controlled by the District: Provided, that in the case of a claim arising out of the operation of an emergency vehicle on an emergency run the District shall be liable only for gross negligence.
 
 
 [9]
 Indeed, to uphold the judgment here we need only determine that defendants are jointly and severally liable for either of these acts. We focus on the felony pursuit in the belief that it provides the starkest contrast to the line of cases on which the defendants' rely and readily exposes the flaw in defendants' reliance on those cases
 
 
 [10]
 The court in Morgan focused on the problems inherent in permitting a jury to second-guess a decision on allocation of police resources. Particularly when, as in the instant case, the police officer acts in violation of specific regulations and standards established to prevent precisely the consequence that has occurred, and when testimony establishes a proper course of action against which to measure a defendant's conduct, we find Morgan wholly inapplicable
 
 
 [11]
 See Joyner v. District of Columbia, 109 Daily Wash.L.Rptr. 369 (Mar. 2, 1981) (recognizing a cause of action of the kind filed by the Biscoes)
 
 
 [12]
 Briefly, as to defendants' claims regarding personal jurisdiction, we affirm on the basis of Judge Greene's memoranda denying defendants' motion for summary judgment and their motion for judgment notwithstanding the verdict. See J.A. 66-69, 87-88. As to Officer Kyle's efforts to relitigate the jury's conclusions on proximate cause, we believe the evidence adduced at trial was more than sufficient to send the issue to the jury, and we surely have no basis on which to conclude that the jury's conclusions were so wholly unreasonable as to require reversal. See Calloway v. Central Charge Service, 440 F.2d 287, 289 & n. 2 (D.C.Cir.1971). Finally, as to the expert economic testimony of which defendants complain, we believe an evidentiary predicate existed for admission of the testimony as solicited by Judge Greene, and, having read the colloquy among counsel in the trial transcript, we conclude that Judge Greene's reformulation of the proffered testimony adequately addressed defendants' concerns. See Tr. at 742-61