Theodore R. BLEDSOE, M.D.,
Appellant,

v.

Brian CROWLEY, M.D.

v.

Sylvia FRIEDMAN, M.D.

No. 87–7168.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 1988.

Decided June 10, 1988.

Charles R. Claxton, Washington, D.C., for appellant.

Paul Kemp, Rockville, Md., for appellees. Joseph Montedonico and Judith R. Catterton, Rockville, Md., were on the brief for appellees.

Katherine D. Savage, Rockville, Md., also entered an appearance for appellees.

Before EDWARDS and WILLIAMS, Circuit Judges, and WEIGEL[*], Senior District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge WILLIAMS.

HARRY T. EDWARDS, Circuit Judge:

This appeal concerns the question whether the trial court, in a diversity action brought in the District Court for the District of Columbia, correctly applied a Maryland statute requiring arbitration of medical malpractice claims. Appellant Theodore Bledsoe, a District of Columbia resident who sought treatment in Maryland, argues that the District Court erred in dismissing his suit for failure to comply with the Maryland statute.

We find, contrary to appellant's argument, that District of Columbia choice of law principles require application of Maryland law in this case. We also reject appellant's contentions that the Maryland legislature intended the arbitration provisions to be applied only with respect to suits in Maryland courts and that appellees somehow waived the arbitration requirement. While we agree with the substantive conclusion reached by the District Court, we believe that a stay pending arbitration, rather than dismissal of appellant's case, is the appropriate disposition. We therefore affirm the District Court's judgment on the merits, vacate the order of dismissal and remand the case for entry of a stay pending completion of the arbitration process.

## I. BACKGROUND

Appellant Theodore Bledsoe, a medical doctor, brought suit in the District Court against Dr. Brian Crowley and Dr. Sylvia Friedman, alleging negligence in their failure to diagnose his brain tumor during the twelve years they treated him for psychiatric disorders. Bledsoe first consulted Dr. Crowley, a psychiatrist, in 1969, because of "occasional inability to control impulsive behavior." He underwent psychoanalysis with Crowley for the next eleven years. In 1979, Crowley referred Bledsoe to another psychiatrist, Dr. Friedman, with whom he engaged in group therapy for two and one-half years. In 1984, some time after Bledsoe had discontinued therapy with both doctors, he was admitted to St. Elizabeth's Hospital in Washington, D.C., where a CAT scan revealed a brain tumor. According to the complaint, the tumor had been present and growing for many years. While Bledsoe's condition improved following removal of the tumor, he allegedly suffered permanent brain damage and loss of vision, which prevented him from pursuing his practice of radiology.

Although Bledsoe resided in Maryland when he began seeing Dr. Crowley, he moved to the District of Columbia at some time thereafter and was a District resident at the time the suit was filed. His radiology practice was at all times in Maryland. Drs. Crowley and Friedman both resided in Maryland. Their practice was located in Maryland, although both were also licensed to practice in the District of Columbia. All of Bledsoe's therapy sessions with both doctors took place in Maryland.

The Maryland Health Care Malpractice Claims Statute, MD.CTS. & JUD.PROC.CODE ANN. §§ 3–2A–01 to –09 (1984 & Supp. 1987), provides that all medical malpractice claims alleging damages in excess of a

---

[*] Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d).

certain jurisdictional amount must be submitted initially to an arbitration panel established pursuant to the statute's provisions. Either party is free to reject the arbitration award, but in such a case the award is admissible in a subsequent court action as the presumptively correct judgment. The party rejecting the award bears the burden of rebutting the presumption and must pay court costs if the verdict ultimately obtained is not more favorable than was the arbitration award. The statute provides, in section 3–2A–02(a)(2), that "[a]n action or suit of [the type covered by the statute] may not be brought or pursued in any court of this State except in accordance with this subtitle."

With the consent of all parties, the District Court proceedings in this case were conducted by Magistrate Patrick Attridge pursuant to 28 U.S.C. § 636(c). Following discovery, the defendants moved for dismissal on the ground that Bledsoe had failed to follow the Maryland arbitration procedure. The Magistrate initially denied the motion, but then granted a renewed motion to dismiss on June 30, 1987, after Judge Joyce Hens Green of the District Court had dismissed a case in which the same issue was raised. The Magistrate held that District of Columbia choice of law principles required application of an "interest analysis," and that this approach dictated applying Maryland law because of the greater interest expressed by that state in the manner in which malpractice claims were to be handled. The trial court also rejected appellant's position that, even if Maryland law governed, the arbitration provisions were applicable only to cases brought in Maryland state courts. *Bledsoe v. Crowley,* No. 86–0928 (D.D.C. June 30, 1987).

Appellant now advances three points in pursuit of this appeal: (1) District of Columbia law, not that of Maryland, should apply; (2) even assuming Maryland law controls, the arbitration provisions should not apply because they were intended to be applied only in Maryland courts, because

they are "procedural," and because it would be unconstitutional to apply them here; and (3) the defendants waived application of the arbitration provisions by failing to raise this defense at an early stage of the proceedings.

## II. ANALYSIS

### A. *Choice of Law*

To determine the applicable law in a diversity case, a federal court must follow the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Therefore, in this case, adhering to the rules of the District of Columbia, we must apply a "governmental interest analysis," which requires a court "to evaluate the governmental policies underlying the applicable conflicting laws and to determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Williams v. Williams,* 390 A.2d 4, 5–6 (D.C.1978); *see also Gaither v. Myers,* 404 F.2d 216, 222–24 (D.C.Cir.1968); *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1270–71 (D.C.1987). Under this approach, potential conflicts of law are assessed as follows:

> When the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails. Where each state would have an interest in application of its own law to the facts, a true conflict exists and the law of the jurisdiction with the stronger interest will apply.

*Biscoe v. Arlington County,* 738 F.2d 1352, 1360 (D.C.Cir.1984) (footnote omitted), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).[1]

The District Court resolved the conflict in favor of the application of Maryland law by determining that Maryland, through passage of the arbitration statute, had

---

[1]. If the interests of the two jurisdictions in the application of their law are equally weighty, the law of the forum will be applied. *Kaiser-*

*Georgetown Community Health Plan, Inc. v. Stutsman,* 491 A.2d 502, 509 & n. 10 (D.C.1985).

manifested a strong public policy concerning the manner in which malpractice claims should be resolved. It found that the District of Columbia, by contrast, had expressed no such interest, because it had adopted no legislation on the subject. The District Court thus decided that there was no true conflict, and that since no other factor outweighed Maryland's strong interest, Maryland law should be applied.

Appellant maintains that the District Court's analysis was defective because it failed to inquire into the law that a court in the *foreign* jurisdiction would apply: in other words, if a Maryland court, applying that state's choice of law principles, would apply District of Columbia law in this case, then Maryland's interest to be weighed against the District's would be much diminished. While we agree that such an inquiry has a place in the governmental interest analysis, *see Biscoe,* 738 F.2d at 1362; *Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense,* 350 F.2d 468, 473–75 (D.C.Cir.1965), *cert. denied,* 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966),[2] we reject appellant's contention that Maryland would apply the law of the District of Columbia in this case. Maryland—unlike the District of Columbia—adheres to the more traditional principle of *lex loci delicti,* which determines the applicable law in tort actions according to the place "where the wrong occurs." *Hauch v. Connor,* 295 Md. 120, 453 A.2d 1207, 1209 (1983). Appellant argues that "[w]hile defendants' negligence here occurred primarily in Maryland, Dr. Bledsoe's injury occurred in the District of Columbia." Appellant's Brief at 9. We disagree. Appellant's attempt to separate the place where the injury occurred from the place where the negligence took place makes no sense in the context of an alleged failure to diagnose a slowly growing brain tumor.[3] Since it is impossible to make such a distinction, a Maryland court would, we believe, apply the general principle that the applicable law is that of the place where the "wrong" occurred. If Dr. Bledsoe was wronged anywhere, it was certainly in Maryland.[4]

Appellant also argues that the District Court gave insufficient weight to the District of Columbia's interests in having its own law applied. He contends that the District government's silence on the question of malpractice reform does not necessarily, as the District Court thought, indicate a lack of interest in the question, for it could equally well support an inference that the District wished to assure its citizens the full remedies of traditional tort law. In the absence of further documentation of the District's putative interest,[5] this argument remains speculative. Even were we to give it full credence, however, we would conclude that Maryland is "the jurisdiction with the stronger interest." *Biscoe,* 738 F.2d at 1360. Where the entire relationship between the parties was centered

2. We note, however, that the cases do not in any way support appellant's characterization of this inquiry as an "initial" step in the analysis, much less his suggestion that a finding that Maryland would apply D.C. law would be dispositive. Appellant's Brief at 8.

3. Appellant cites cases holding that "[t]he place of injury is the place where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir.1986) (explaining Maryland law); *Uppgren v. Executive Aviation Servs., Inc.,* 326 F.Supp. 709, 711–12 (D.Md.1971). These cases are wholly inapposite here. *Uppgren* was a product liability suit, where a helicopter accident in one state was allegedly caused by negligent repair work in another state. *Johnson* involved an action by a distributor against a manufacturer, where the manufacturer's allegedly tortious action in one state produced an injury in another. Both cases thus involved clearly identifiable and separable incidents of wrongful act and injury. Appellant acknowledged at oral argument that no precedent could be found in the case law for application of this distinction in the context presented here.

4. Even were one to accept appellant's proposed dichotomy, it would not be evident that the "injury" occurred in the District of Columbia. While Dr. Bledsoe resided there during most (but not all) of the period he was in treatment, he presumably spent a significant portion of his time in Maryland, where his practice was located. Thus, the undiagnosed tumor apparently continued to grow in both jurisdictions.

5. Appellant has cited evidence, in summary form, that malpractice legislation was introduced in the District of Columbia City Council in the mid–1970s. Appellant's Brief at 13 n. 1. We can conclude nothing from this submission.

in Maryland and the allegedly tortious conduct occurred in that state, Maryland's interest in regulating the activity must be deemed the stronger one. As this court has previously stated, "[t]he state where the defendant's conduct occurs has the dominant interest in regulating it...." *Biscoe*, 738 F.2d at 1361 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146 comment d (1969)). This is particularly so where, as here, it is impossible meaningfully to separate the injury from the tortious conduct, and where other factors—such as the residence or place of business of the parties—do not point in the opposite direction. It is simply not possible to maintain in this case that "important interests of the forum would be sacrificed to advance *equal or lesser* interests of another jurisdiction...." *Mazza v. Mazza*, 475 F.2d 385, 391 (D.C.Cir.1973) (emphasis added).[6]

### B. *Application of Maryland Law*

■ Having determined that the substantive law applicable to this case is that of the State of Maryland, we turn to the question of whether that law requires application of the arbitration provisions in this case. The coverage provision of the Maryland arbitration statute reads, in relevant part, as follows:

*Claims and actions to which subtitle applicable.*—(1) All claims, suits, and actions, including cross claims, third-party claims, and [wrongful death actions], by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought are subject to and shall be governed by the provisions of this subtitle.

(2) An action or suit of that type may not be brought or pursued in any court of this State except in accordance with this subtitle.

....

MD.CTS. & JUD.PROC.CODE ANN. § 3–2A–02(a) (Supp.1987).

Seizing particularly on the last sentence, in the foregoing paragraph "(2)," appellant contends that the statute by its own terms limits its application to Maryland state courts. This argument, however, has been thoroughly considered and rejected in *Davison v. Sinai Hospital*, 462 F.Supp. 778 (D.Md.1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980). Relying on a study of the statute's legislative history, *Davison* held that the Maryland law could not be construed to allow a plaintiff to avoid the requirements of arbitration merely by filing a diversity action in federal court. Rather, the court in *Davison* held that the disputed provision in the Maryland statute was only meant to exclude minor claims filed in state district courts from the arbitration requirements. 462 F.Supp. at 779.[7] Recently, the Maryland Court of Appeals has confirmed that this statutory interpretation is correct: "We agree with the *Davison* court that the legislature did not intend to limit the federal court's jurisdiction, and that common sense requires that the definition of 'court' found at § 3–2A–01(c) must encompass the federal District Court when jurisdictional requirements are met." *Ott v. Kaiser–*

---

6. *Kaiser–Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502 (D.C.1985), is not to the contrary. In that case the District of Columbia Court of Appeals determined that the District's interest in application of its law was stronger than Virginia's, despite the fact that the plaintiff was a resident of Virginia and the allegedly negligent medical treatment had taken place there. The court's decision was based largely on three factors: (1) the two defendants were District of Columbia corporations, and the District therefore had a significant interest in holding them fully liable for their negligence; (2) the plaintiff was employed in the District, the health plan under which she was treated was a benefit of that employment, and, therefore, the District's interest in the protection of its workforce was implicated; and (3) Virginia's interest in imposing a liability cap was primarily in protecting Virginia health care providers, and that interest was weaker where the defendants were foreign corporations with their principal places of business outside Virginia. *Id.* at 509–11. In the present case, none of these factors would point to a stronger interest for the District of Columbia.

7. We note also that the language of subsection 3–2A–02(a)(1) that "[a]ll claims ... are subject to and shall be governed by the provisions of this subtitle" contains no reference to any particular courts.

*Georgetown Community Health Plan, Inc.,* 309 Md. 641, 526 A.2d 46, 50 (1987); *see also Group Health Ass'n v. Blumenthal,* 295 Md. 104, 453 A.2d 1198, 1202 n. 5 (1983).

Appellant also argues that the Maryland statute was not intended to have "extra-territorial" application because it "is procedural and is not part of the substantive law of Maryland for choice of law purposes." Appellant's Brief at 16. Appellant relies here on section 3–2A–09, which specifies that "[t]he provisions of this subtitle shall be deemed procedural in nature...." The context of this statement makes clear, however—as the *Davison* court found—that it "was merely intended to indicate that the legislature was not attempting to create a new cause of action in passing this statute." 462 F.Supp. at 780.[8]

We have some difficulty comprehending the precise nature of appellant's argument. The only way in which the substantive/procedural distinction makes sense in the context in which appellant raises it is as an argument that the Maryland provision is a "procedural" one, which a federal court would not apply under the doctrine of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[9] This argument was considered and properly rejected by *Davison.* That court found that the Maryland arbitration requirement should be treated as a "substantive" provision in order to comply with the policies underlying *Erie* that (1) the character or result of litigation not differ materially because the suit was brought in federal court, and (2) incentives to forum shopping be avoided.

462 F.Supp. at 780 (citing *Hanna v. Plumer,* 380 U.S. 460, 467, 85 S.Ct. 1136, 1141, 14 L.Ed.2d 8 (1965)); *accord Ott v. Kaiser-Georgetown Community Health Plan, Inc.,* 309 Md. 641, 526 A.2d 46, 50 n. 4 (1987).

As far as we can discern it, however, appellant's argument appears to be based solely on Maryland choice of law principles, according to which the law of the forum is applied to "procedural" matters. The legislature, it is argued, by defining the statute as procedural, intended to deny it "extra-territorial" application: while a federal court sitting in Maryland might apply the arbitration statute, a federal court sitting in another state could not do so. *See* Appellant's Brief at 16–19. This is a strange argument indeed. The only relevant difference between a federal court sitting in the District of Columbia and one sitting in Maryland is in the starting point of applying the choice of law principles of the forum state. Once it has been determined, through application of those principles, that Maryland law governs, a D.C. federal court would apply Maryland law no differently than would a Maryland federal court. "Whenever a forum under no compulsion to do so elects as a matter of conflicts policy to apply the law of another jurisdiction, that law is given 'extraterritorial effect'...." *Mazza v. Mazza,* 475 F.2d 385, 391 (D.C.Cir.1973). In any event, it is inconceivable that the Maryland legislature could have intended to bring about a different result merely by labeling the statute "procedural," even if it had the power to do so.[10]

---

**8.** Section 3–2A–09 reads in full: "The provisions of this subtitle shall be deemed procedural in nature and shall not be construed to create, enlarge, or diminish any cause of action not heretofore existing, except the defense of failure to comply with the procedures required under this subtitle."

**9.** The adjectives "substantive" and "procedural" cannot be understood in the *Erie* context by reference to their common-sense meanings; rather, a federal court must look to the policies underlying *Erie* in order to determine whether to apply state or federal law. *See Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945); *Hanna v. Plumer,* 380 U.S. 460, 465–68, 85 S.Ct. 1136, 1140–42, 14

L.Ed.2d 8 (1965). Nonetheless, the terms "procedural" and "substantive" provide a convenient shorthand.

**10.** Appellant relies heavily on *Reichelderfer v. Illinois Cent. Gulf R.R.,* 513 F.Supp. 189 (N.D. Miss.1981). A careful reading of that opinion suggests, however, that the reason for the court's refusal to apply a Tennessee arbitration statute in Mississippi federal court was that the statute in question—in contrast to the Maryland statute at issue here—was "procedural" in the *Erie* sense. *Id.* at 192–93. To the extent that several passages in the *Reichelderfer* opinion do appear to accept the notion that the Tennessee statute must be applied in Tennessee federal

Finally, we reject appellant's contention that application of the Maryland statute in this context violates the privileges and immunities clause of the Fourteenth Amendment because it denies a citizen of the District of Columbia access to a District of Columbia court. Appellant's Brief at 20. Appellant has not been barred from pursuing a remedy in the District of Columbia courts but rather is merely required first to submit to arbitration pursuant to the Maryland statute. *Cf. Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860, 865 (1982) (analogizing the arbitration requirement to the doctrine of exhaustion of administrative remedies).

### C. *Waiver*

■ Appellant's third objection is that the appellees failed to raise the issue of the Maryland arbitration act until after extensive discovery had taken place. Citing a provision of the statute that permits waiver of the arbitration requirement, he argues that "by electing to proceed in the District Court to the virtual eve of trial, defendants implicitly agreed to waive compliance with the Maryland Act." Appellant's Brief at 21.

This argument has no merit. In the first place, the statutory waiver provision on which appellant relies, section 3–2A–06A, was an amendment that became effective on July 1, 1987—the day after the District Court's decision in this case. Second, the waiver provision requires that the waiver be in writing and signed by all parties or their attorneys. This precludes any "implicit" waiver. Finally, to the extent that appellant relies on the timeliness provisions of FED.R.CIV.P. 12(h), *see* Appellant's Brief at 21–22, appellees' motion to dismiss was clearly timely, either under rule 12(h)(2) (failure to state a claim on which relief can be granted) or 12(h)(3) (lack of subject matter jurisdiction).

### D. *Disposition*

■ When a trial court determines that arbitration is required in a case before it, it may order a stay of the judicial proceedings pending completion of the arbitration process. We believe that this was the appropriate course to be followed in this case.

There is no question of the District Court's authority to order a stay: "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936); *see also Gavlik Constr. Co. v. H.F. Campbell Co.*, 526 F.2d 777, 784 (3d Cir.1975). Nor is there anything particular to the Maryland arbitration statute that would require dismissal rather than a stay. The Maryland Court of Appeals has held that "the Act does not divest the ... court of subject matter jurisdiction," *Tranen v. Aziz*, 304 Md. 605, 500 A.2d 636, 639 (1985), and that the final step in the arbitration process, the filing of a notice of rejection of the award with the Director of the Health Claims Arbitration Office, is a prerequisite not to *filing* a court action to nullify the arbitration result, but merely to *maintaining* such an action. *Tranen*, 500 A.2d at 639–40; *see* MD.CTS. & JUD.PROC.CODE ANN. § 3–2A–06(a), (b) (Supp.1987). Thus, it would appear that a prematurely filed court action need not be dismissed but can be stayed pending arbitration and the filing of the notice of rejection.

In opposing appellees' motion to dismiss, appellant properly placed before the trial court the alternative of a stay. *See* Plaintiff's Memorandum in Opposition to Defendant Friedman's Motion to Dismiss, Record Document ("R.D.") 81, at 4–5; *see also* Defendant Friedman's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, R.D. 84, at 3 (opposing a stay). Nonetheless, the Magistrate failed to consider this option. At oral argument of this appeal, neither party disagreed with the proposition that a stay pend-

court but not in federal courts outside that state, we are compelled to reject such reasoning as

unsound.

ing arbitration would have been appropriate. We were also informed at oral argument that arbitration proceedings are now underway in Maryland. Under these circumstances, we perceive no reason why the action should have been dismissed rather than stayed by the District Court. We therefore hold that the District Court abused its discretion by rejecting appellant's request for a stay rather than a dismissal.[11]

## CONCLUSION

For the reasons stated above, we hold that appellant is required to comply with the provisions of the Maryland arbitration statute, but that the District Court erred in dismissing rather than staying the action. We therefore affirm the judgment of the District Court on the merits, vacate the order of dismissal and remand the case with instructions to the District Court to enter a stay pending completion of the arbitration process currently underway in Maryland.[12]

*So ordered.*

WILLIAMS, Circuit Judge, concurring:

I concur wholeheartedly in Judge Edwards's excellent opinion and write separately only to consider an additional element in the choice of laws problem.

The Restatement (Second) of Conflict of Laws (1971), to which District of Columbia courts often turn for guidance,[1] lists as the first relevant "factor" in interest analysis "the needs of the interstate ... system [ ]." § 6(2)(a). This of course suggests—quite

rightly—that states have shared, non-parochial interests. In the medical malpractice context, with which we deal here, there are systemic interests in (1) states' being able to develop coherent policies governing medical malpractice liability and (2) individuals' being able to take advantage of medical services outside their home jurisdictions.

For realization of the first interest, a state that seeks to reduce medical costs by reducing the burden of malpractice liability must be able to assure providers that the state's rules will actually apply to all (or virtually all) cases. For example, if Maryland places limits on malpractice recoveries but its medical providers are exposed to liability under the laws of states without such controls, the charges of persons providing medical services in Maryland will rise to carry the burden of expected liabilities to out-of-staters. This result thwarts not only the ability of each state to establish a policy and secure whatever benefits it may offer, but also the system's capacity to conduct and evaluate experiments in liability policy.

The above analysis assumes that the Maryland rule here at issue—requiring arbitration as a precondition to litigation and giving the arbitration result the weight of a presumption in any later suit—is directed at reducing at least the total costs of medical malpractice liability. That inference seem inescapable, and is independent of whether the rule is expected to affect net plaintiff recoveries.

Applying the rule of the patient's domicile might at first blush seem easily reconciled with the interest in state development

---

**11.** We are aware that the *Davison* court ordered dismissal (without prejudice) of the action before it, where the plaintiffs had failed to comply with the Maryland arbitration statute. 462 F.Supp. at 781. The court's opinion gives no indication, however, that the plaintiffs in that case had asked the court to stay rather than dismiss the action.

**12.** In ordering that a stay be entered, we express no opinion on the effect of the stay on any statute of limitations questions that might later be raised, nor about whether, following arbitration, the case should be heard in this district or in the District of Maryland.

**1.** *See Gaither v. Myers,* 404 F.2d 216, 222 (D.C. Cir.1968); *Finance America Corp. v. Moyler,* 494 A.2d 926, 929–30 & n. 7 (D.C.1985); *Gabrielian v. Gabrielian,* 473 A.2d 847, 851 n. 11 (D.C. 1984); *Hodge v. Southern Ry. Co.,* 415 A.2d 543, 544 (D.C.1980); *Rose v. Silver,* 394 A.2d 1368, 1371 n. 2 (D.C.1978); *Clagett v. King,* 308 A.2d 245, 248 (D.C.1973); *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431, 438 (D.C.1972). *See also Biscoe v. Arlington County,* 738 F.2d 1352, 1361 (D.C.Cir.1984) (applying D.C. conflicts law), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).

of liability policy. If courts apply the law of the patient's domicile, medical associations can be expected to promptly inform Maryland providers, who in turn can reject would-be out-of-state patients. By contrast, potential out-of-state patients may not so readily learn that use of Maryland providers entails special malpractice rules.

On balance, though, the law of the jurisdiction where the services are provided seems to better accommodate the systemic values. For medical providers to screen out incoming patients altogether would completely destroy individuals' ability to seek out expert medical help throughout the United States. The Mayo Clinic in Minnesota is simply the most prominent of many providers whose reputation draws patients from the entire country. A system depriving the ill of these benefits would seem a tragic waste.

A more limited response to control by the law of the patient's domicile would be for providers to accept out-of-state patients, but insist on agreements binding them to local law. But such a practice might founder on rules refusing to enforce agreements waiving rights to recover in tort—including partial waivers such as would be entailed by application of the Maryland rule here. This difficulty might, of course, be salvaged by a halfway rule: that the law of the state where the services are provided would govern the validity of waivers. Such a halfway rule seems an irreducible minimum for achievement of basic systemic goals.

But the stronger rule—that substantive liability is defined by the law of the place services are rendered—seems preferable. While medical associations can readily communicate with members as to liability hazards, and alert them to possible responses, patients are inherently on notice that journeying to new jurisdictions may expose them to new rules. The maxim "When in Rome do as the Romans do" bespeaks the common sense view that it is the traveler who must adjust.

Here of course we act only as surrogates for the District of Columbia courts, and the District's only case on conflicts in medical malpractice law rejected the law of Virginia, where the services were provided. *Kaiser–Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502 (D.C. 1985). Judge Edwards amply distinguishes the case. *See* Maj.Op. at 643 n. 6. For purposes of considering § 6(2)(a) of the Restatement, however, it appears that no one even brought the systemic values to the attention of the court. The opinion did note that Virginia's limitation on liability aimed in part at reducing the medical fees charged Virginia residents, 491 A.2d at 510, but assumed Virginia's primary interest lay in benefitting providers as opposed to consumers, *id*. Reasoning from that assumption, the court stated that Virginia's "interest in the application of its statute becomes attenuated when its intended beneficiaries are foreign corporations with principal places of business outside the State." *Id*. at 511. Such a characterization ignores the systemic interest in states' being able to adopt policies reducing health care costs for consumers. That interest is little affected by the domicile of the defendant provider. It is true that so long as purely domestic Virginia medical providers can count on the application of Virginia law in all cases arising out of provision of services there, their rates will reflect benefits due to Virginia restrictions; regardless of the conflicts rule, out-of-state firms, if they are to operate in Virginia, will have to match them. (A motel chain cannot charge New York City rates for rooms in Arkansas because it is incorporated or headquartered in New York.) But adoption of a conflicts rule that subjects out-of-state providers to more costly tort regimes effects a troubling discrimination, and if these firms are an important part of the potential supply of medical services in Virginia (i.e., if the purely domestic supply is inelastic), the presence of the burden will increase the market price of all those services.

Thus it seems unlikely that the location of the provider's incorporation or headquarters undermines the systemic analysis militating in favor of applying the law of the state where the services are provided. (This is a neutral principle and holds equal-

ly true if the state of provision has policies favoring high malpractice recoveries.) For our purposes it is enough to note that, given the D.C. courts' practice of looking to the Restatement for guidance on conflicts matters, there is no reason to suppose that they would not recognize the systemic concerns if properly brought to their attention.