**ABB DAIMLER–BENZ TRANSPOR-
TATION (NORTH AMERICA),
INC., Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION and New Jersey Tran-
sit Corporation, Defendants.**

**L.K. COMSTOCK & COMPANY,
INC., Plaintiff–Intervenor,**

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION, Defendant.**

Civil Action No. 96–738(GK).

United States District Court,
District of Columbia.

June 8, 1998.

Edward Flanders, Robert E. Bailey, Takemi Ueno, Winthrop, Stimson, Putnam & Roberts, New York City, Mark Seiden, Bernard L. Sacks, Gogick & Seiden, New York City, for ABB Daimler–Benz Transportation–North America, Inc.

Jeffrey Gerald Gilmore, Michael A. Gatje, Wickwire Gavin, P.C., Vienna, VA, for National Railroad Passenger Corp.

John Hamilton Korns, II, Oppenheimer, Wolff, Donnelly & Bayh, L.L.P., Washington, DC, Eldad Philip Isaac, State of New Jersey, Division of Law, Dept. of Law & Public Safety, Newark, NJ, for New Jersey Transit Corp.

David Taylor Case, Kirkpatrick & Lockhart, L.L.P., Washington, DC, George B. Foster, John R. Dingess, Kirkpatrick & Lockhart, L.L.P., Pittsburg, PA, for L.K. Comstock and Co., Inc.

Philip LeBretoo Douglas, Winthrop, Stimson, Putnam & Roberts, New York City, for Fed. Ins. Co.

Michael A. Gatje, Wickwire Gavin, P.C., Vienna, VI, for Alison Conway Smith.

Andrew Lewis Shapiro, Ross, Dixon, Masback, L.L.P., Washington, DC, for L.S. Transit Systems, Inc.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

This matter is before the Court on Defendant New Jersey Transit Corporation's Motion for Summary Judgment And Partial Summary Judgment On All Claims of Adtranz and Comstock pursuant to Fed. R.Civ.P. 56(b) [# 219], Defendant Amtrak's Motion for Summary Judgment Against Adtranz pursuant to Fed.R.Civ.P. 56(b) [# 217], and Defendant Amtrak's Motion for Summary Judgment Against L.K. Comstock & Co. pursuant to Fed.R.Civ.P. 56(b) [# 218].

Having considered the Motions, Oppositions, Replies, the four and a half hour oral argument, voluminous pleadings, and the entire record, the Court concludes that:

(1) New Jersey Transit's Motion for Summary Judgment is **denied in part and granted in part** as follows: (a) denied with respect

Alieen Meyer, David Andrew Crichlow, Winthrop, Stimson, Putnam & Roberts, Washington, DC, Philip LeBretoo Douglas,

to the fraud claims; (b) **granted** with respect to the application of New Jersey law to all claims against New Jersey Transit; (c) **granted** with respect to tort claims and punitive damages claims under the New Jersey Tort Claims Act; (d) **granted** with respect to unjust enrichment and quantum meruit claims under the New Jersey Contractual Liabilities Act; (e) **granted** with respect to unjust enrichment and quantum meruit claims under New Jersey common law; and (f) **denied** with respect to tort claims under New Jersey common law;

(2) Amtrak's Motion for Summary Judgment Against Adtranz is **denied in part and granted in part** as follows: (a) **denied** with respect to Rule 17(a); (b) **denied** with respect to the fraud claims [1]; (c) **denied** with respect to accord and satisfaction; (d) **denied** with respect to promissory estoppel; (e) **granted** with respect to damages on high speed train project; and (f) **denied** with respect to all damages and costs regarding the Sunnyside Project; and

(3) Amtrak's Motion for Summary Judgment Against Comstock is **granted.**

## I. *Factual Background* [2]

ABB Daimler–Benz ("Adtranz") is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Adtranz designs, manufactures, and sells electrical equipment for rail transportation systems. For the purposes relevant to this case, Adtranz is the successor in interest to ABB Traction, Inc. ("ABB"), which signed the original contract with Amtrak. On January 1, 1996, ABB was merged into AEG Transportation Systems, Inc ., and the name of the new entity was changed to Adtranz. For ease of reference, ABB will be referred to as Adtranz.

Defendant National Railroad Passenger Corporation ("Amtrak") is a private corporation organized and existing under the laws of the United States, with its principal place of business in Washington, D .C. Defendant New Jersey Transit ("NJT") is a State of New Jersey corporation, organized under New Jersey law, with its principal place of business in Newark, New Jersey. NJT was established by the New Jersey Public Transportation Act of 1979 which created NJT as an instrumentality of the state of New Jersey exercising public and essential governmental functions. N.J. Stat. Ann. § 27:54–4 (West 1994). NJT provides commuter passenger rail service through a subsidiary, New Jersey Transit Rail Operations, Inc., within New Jersey and between New Jersey and New York City. Portions of NJT's rail operations in New Jersey and New York City run over the Northeast Corridor (the "NEC") controlled by defendant Amtrak.

This case arises out of a November 1993 contract (the "Contract") between Adtranz and Amtrak, under which Adtranz was to supply equipment and related services for the Static Frequency Converter Station (the "SFCS"), located on Amtrak's property at the Sunnyside Yard in Long Island City, New York ("the Project"). The purpose of the Project is to increase the available power on Amtrak's traction power system along Amtrak's NEC by converting energy from power lines owned and operated by Consolidated Edison Company of New York, Inc. ("Con Edison") into a form suitable for use by railway traction equipment. The SFCS would convert the 60 Hz electric power being supplied by Con Edison to 25 Hz power which would be usable by both NJT and Amtrak.

Although not a signatory to the Contract, NJT, like Amtrak, stands to benefit from the increased power to be generated by the Project. Under an earlier agreement with Amtrak executed in February 1993, called the New Initiatives Agreement (the "NIA"), NJT agreed to seek federal grant funds and, once

---

**1.** Amtrak incorporates by reference NJT's arguments for summary judgment on all the fraud claims. (*See* Amtrak's Mot. for Summ. J. Against Adtranz at 5.)

**2.** Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The Court thus takes these facts from the moving parties' Statements of Material Facts Not in Dispute.

obtained, to pass them through to Amtrak, along with New Jersey tax revenues, for the design and construction of the SFCS. In return, NJT was granted substantial oversight responsibilities with respect to use of those funds. The NIA provided that the upgrading work to be performed at the Project would be "treated as a joint benefit and joint liability project" by Amtrak and NJT. (NIA, Adtranz' Opp'n to NJT's Mot. to Dismiss, Ex. E, p. 10; NIA, Ex. 3.)

This project would permit NJT to increase its rail service into New York's Pennsylvania Station. Both Amtrak and NJT agreed in the NIA that the SFCS Project would enable them to operate trains more reliably and to provide increased levels of rail service both along Amtrak's NEC in New Jersey and from New Jersey into New York City.

NJT and its technical consultant L.S. Transit Systems Inc. ("LSTS"), headquartered in New Jersey, have been actively involved in all aspects of the Project. For example, NJT and LSTS worked on preparation of the Performance Specifications, the procurement process, contract negotiations and the award of the November 2, 1993 Design/Build Contact between Amtrak and Adtranz. The Project was set up with a joint management structure between Amtrak and NJT. (NIA, p. 24.)

In January 1993, Amtrak issued a Request for Proposals ("RFP") for the Project. In connection with the Project, on April 2, 1993, Adtranz entered into a Consortium Agreement with L.K. Comstock & Co., Inc. ("Comstock") for the purpose of: (1) preparing and submitting a proposal to Amtrak for the project; (2) jointly negotiating and signing in the name of Adtranz a contract with Amtrak based upon the proposal; and (3) jointly performing any contract they were awarded. Pursuant to the Consortium Agreement, Adtranz took responsibility for the design and procurement of equipment and Comstock took responsibility for all construction.[3]

Adtranz submitted its proposal, and on November 2, 1993, was awarded the Contract

to supply equipment and related services. In March 1994, Adtranz submitted to Amtrak, as required by the Contract, its design drawings and specifications at the 60% completion stage ("60% Design Submittal"). Amtrak rejected the 60% Design Submittal, which was based on the provision of cycloconverter equipment by Adtranz. After rejection of the 60% Design Submittal, Amtrak agreed to allow Adtranz to continue the Contract, but required Adtranz to change its cycloconverter technology to dc-link technology at no additional cost to Amtrak. This change in technology significantly increased costs for both Adtranz and Comstock by approximately $10 million.

Adtranz alleges that rejection of the 60% Design Submittal was based on the setting of new and undisclosed performance requirements for the SFCS by Amtrak and NJT, which were inconsistent with those set out in the original RFP and Contract. Adtranz further alleges that the change in performance requirements was part of a conspiracy by NJT and Amtrak to force Adtranz to upgrade the original Project requirements to the more expensive dc-link technology, at no additional cost to Amtrak. Adtranz further claims that the changed design specifications caused Adtranz to incur significant cost increases and other losses as a result of being forced to redesign the project. Adtranz is suing Amtrak for breach of contract, fraud, quantum meruit and unjust enrichment, and seeks both compensatory and declaratory relief. It also brings claims for fraud, quantum meruit and unjust enrichment against NJT, as well as an additional claim for tortious interference with the Contract.

Plaintiff–Intervenor Comstock seeks a declaratory judgment as to liability, and damages for increased construction costs incurred by Comstock in connection with the Project. Comstock alleges that Amtrak's wrongfully imposed change in technology to dc-link, increased Comstock's construction costs. Comstock has not been paid for its increased costs and alleges that it will not be

---

**3.** Comstock claims that pursuant to the Consortium Agreement Comstock has the right to sue Amtrak in the name of Adtranz for any claims related to the construction of the Project. Amtrak did not know the nature of Comstock's ability to sue as a result of the Consortium Agreement. *See* discussion, *infra*.

paid by Adtranz until Amtrak pays Adtranz. Comstock also asserts a fraud claim against both NJT and Amtrak.

## II. *Standard for Summary Judgment*

A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(b)-(c). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the movant has met this burden, a court must consider all factual inferences in the light most favorable to the non-moving party. *McKinney v. Dole*, 765 F.2d 1129, 1135 (D.C.Cir.1985). Once the moving party makes its initial showing, however, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *McKinney*, 765 F.2d at 1135. Moreover, "[i]n determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Local Rule 108(h).

## III. *Analysis*

Defendant NJT seeks summary judgment against Plaintiffs Adtranz and Comstock pursuant to the New Jersey Tort Claims Act, the New Jersey Contractual Liabilities Act, and New Jersey common law. NJT argues that New Jersey law applies to all the claims against NJT because it is an instrumentality of the state of New Jersey. As such, NJT is immune from Adtranz' lawsuit. NJT also seeks partial summary judgment against Plaintiffs' fraud claims arguing that Adtranz

has not met the standard of clear and convincing evidence necessary to show that fraud has been committed by NJT and Amtrak. Further, NJT seeks summary judgment on all claims arguing that since the fraud claims must be dismissed, this Court lacks personal jurisdiction over NJT and venue and service of process are improper.

As to Defendant Amtrak, it first seeks summary judgment against Adtranz arguing that fraud was not committed by Amtrak and NJT, and therefore the claim must be dismissed. Second, Amtrak argues that the doctrines of accord and satisfaction and/or promissory estoppel bar Adtranz from claiming any and all costs and losses related to the change in technology. Third, Amtrak filed a separate motion for summary judgment against Comstock arguing that Comstock's derivative fraud claims should be dismissed because Adtranz was not defrauded, and even if it was Amtrak could not reasonably anticipate Comstock's reliance on any representations allegedly made by Amtrak. Fourth, Amtrak argues that both Adtranz and Comstock failed to justify the use of a "total cost method" of damage calculations, and, therefore, those damage calculations should be stricken. Fifth, Amtrak argues that Adtranz' and Comstock's punitive damages claims should be stricken as a matter of law and fact.

Finally, Amtrak argues that summary judgment should be granted against all claims raised against Amtrak because both Adtranz and Comstock are not the real parties in interest in this law suit. Amtrak argues that Comstock cannot sue for breach of contract because there was no contract between Amtrak and Comstock; therefore, Comstock has no privity of contract with Amtrak.

The Court will address the arguments raised by the Defendants in the following order: (1) whether Adtranz is a real party in interest under Fed.R.Civ.P. 17(a); (2) whether Comstock has authority to sue; (3) Adtranz' fraud claims; (4) NJT's choice of law arguments; (5) Amtrak's affirmative defenses of accord and satisfaction and promissory estoppel; and (6) damages claims.

## A. Rule 17(a) [4]

On April 2, 1993, some seven months prior to being awarded the Contract, Adtranz entered into an Internal Cooperation Agreement ("Cooperation Agreement") with ABB Traction AB ("Adtranz (Sweden)"), a corporation organized under the laws of Sweden that is a separate and distinct entity from Plaintiff Adtranz. (Amtrak's Mot. Summ. J. Against Adtranz, Ex. E.) This Cooperation Agreement was entered into without the knowledge, consent or approval of Amtrak. Amtrak argues that under the Cooperation Agreement, Adtranz assigned to Adtranz (Sweden) all risks and responsibilities for the Project in the event the contract was awarded to Adtranz. The Cooperation Agreement also included an indemnification of Adtranz by Adtranz (Sweden) for any liability that might arise out of the project.

The Cooperation Agreement states in relevant part, that:

[I]n consideration of the Parties [Adtranz(Sweden) and Adtranz] having reached a mutual understanding about the respective actual scope and consequent liability in the Project by accepting that all Project responsibility and liability remains with [Adtranz (Sweden) ], which therefore internally assumes the actual role of Contractor, although [Adtranz] will externally bid, and if awarded the Project, sign as the prime contractors [sic];

the parties have agreed on the following:

1. Since the two main parties involved in the Project—L.K. Comstock and [Adtranz (Sweden) ]—cannot bid as consortium, as this set up was rejected by Amtrak, the bid will be submitted in the name of [Adtranz]. [Adtranz] will also sign the internal Consortium Agreement with L.K. Comstock, with a back-to-back agreement with [Adtranz (Sweden) ] by which [Adtranz (Sweden) ] assumes all responsibility and liability thereto.

2. [Adtranz (Sweden) ] internally relieves [Adtranz] of all responsibility and liability related to the performance of the Project and [Adtranz (Sweden) ] agrees to defend and indemnify [sic] [Adtranz] against any claims, losses or damages arising therefrom, except as agreed upon separately in a joint signed agreement (if any).

3. Internally between [Adtranz (Sweden) ] and [Adtranz], [Adtranz (Sweden) ] will have the role of leader in the Project and [Adtranz] will make no decisions on behalf of [Adtranz (Sweden) ] or the Project without prior consultation and approval.

. . . .

7. If the proposal effort successfully turns into an order for the Project, [Adtranz (Sweden) ] is responsible for all contract requirements, [Adtranz (Sweden) ] will reimburse [Adtranz] for actual work done and approved expenses. [Adtranz] agrees to provide office facilities.

8. Unless terminated earlier if the proposal is unsuccessful, this Agreement will continue until the Final Acceptance of the works [sic] by Amtrak and until all liabilities of this Agreement have been settled and paid.

(Amtrak's Mot. for Summ. J. Against Adtranz, Ex. E.)

In light of the Cooperation Agreement, Amtrak argues that Adtranz is not the proper party to this lawsuit. Adtranz fails to answer the argument that its responsibilities and performance obligations were assigned to Adtranz (Sweden), and simply states that the Cooperation Agreement was entered into because Adtranz (Sweden) possessed the technical expertise needed for the Project.

"It is an elementary principle of contract interpretation that the plain and unambiguous meaning of a written agreement is controlling, in the absence of some clear evidence indicating a contrary intention." *Pennsylvania Ave. Dev. Corp. v. One Parcel*

---

4. In its pleadings Amtrak incorrectly labeled this argument "standing to sue". The Court recognizes that this is not a standing to sue argument, but rather a Rule 17(a) argument. Amtrak did, however, correctly make a Rule 17(a) argument in the body of its briefs. Thus, the Court will address this issue in its Opinion.

*of Land in the District of Columbia,* 670 F.2d 289, 292 (D.C.Cir.1981) (quoting *Vogel v. Tenneco Oil Co.,* 465 F.2d 563, 565 (D.C.Cir.1972)). It is clear from the language of the Cooperation Agreement between Adtranz and Adtranz (Sweden) that Adtranz does not have an enforceable interest in the litigation because Adtranz assigned its rights to Adtranz (Sweden). *See York Blouse Corp. v. Kaplowitz Bros., Inc.,* 97 A.2d 465 (D.C.1953). The assignment gives the assignee "the present right to pursue this litigation." *Macondo's Profit Corp. v. Motorola Communications & Elec., Inc.,* 863 F.Supp. 148, 150 (S.D.N.Y.1994). Therefore, Adtranz (Sweden) is the only party who could suffer damages, and thus, the only party who can seek recovery.

Fed.R.Civ.P. 17(a) provides that

> [e]very action shall be prosecuted in the name of the real party in interest.... [A] party with whom or in whose name a contract has been made for the benefit of another ... may sue in that person's own name without joining the party for whose benefit the action is brought.

However, the Rule also provides that "no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for the ratification". *Id.* Such ratification "shall have the same effect as if the action had been commenced in the name of the real party in interest." *Id.*

Since Amtrak filed its motion for summary judgment on March 12, 1998, arguing that Adtranz is not the real party in interest, Adtranz filed on March 25, 1998, the declaration of Johan Lagercrantz the General Counsel of Adtranz (Sweden). That declaration states that Adtranz (Sweden) ratifies the present lawsuit, authorizes the continuation of this action, and agrees to be bound by the result of such action. (Lagercrantz Decl. ¶¶ 9–10.) Consequently, Adtranz does meet all the requirements of Rule 17(a) to bring the present lawsuit, and as such Amtrak's motion for summary judgment against Adtranz for not being the real party in interest must be **denied.**

**B. Authority to Sue**

■ Amtrak argues that since Comstock is not a party to the Contract between Amtrak and Adtranz, it should be dismissed from the case. Comstock counters that it is not suing for breach of contract in its own name, but rather, it is suing in the name of Adtranz, which is in privity of contract with Amtrak. Comstock argues that it has the right to sue Amtrak pursuant to the Consortium Agreement entered into by Adtranz and Comstock which divided responsibility for performance of the Contract between the two companies. Comstock claims that the Consortium Agreement gave it the right to sue Amtrak in the name of Adtranz for any claims related to its construction of the Project. Section 6.2.7 of the Consortium Agreement provides, in relevant part, as follows:

> After consultation with [Adtranz], LKC shall be entitled to pursue, in the name of [Adtranz] but at its own expense, all rights and remedies against Amtrak available under law of the [Adtranz/Amtrak] Contract and any subcontract, and the Leader shall take any ministerial steps necessary to permit the prosecution of all such claims and actions.

(Amtrak's Mot. for Summ. J. Against Comstock, Ex. D.) Comstock argues that this provision grants Comstock the right to pursue claims against Amtrak under the Contract.

Comstock's argument is not persuasive for several reasons. First, Amtrak is not bound by the Consortium Agreement between Adtranz and Comstock since it was not a party to that Agreement. Second, and more importantly, the Contract between Amtrak and Adtranz specifically prohibits any such assignment of rights without Amtrak's consent. Section 6.01 of the Contract provides as follows:

> The Contractor shall not assign the Contract nor delegate his responsibility under the Contract documents without the written consent of the Contracting Officer, *nor shall the Contractor assign any moneys due or to become due to him* thereunder, without the previous written consent of the Contracting Officer.

(Amtrak's Mot. for Summ. J. Against Comstock, Design/Build Contract between Amtrak and ABB, Ex. E at GP–6.)(emphasis added)

■ "Parties may . . . prohibit the assignment of any contract and declare that neither personal representatives nor assignees shall succeed to any rights in virtue of it, or be bound by its obligations." *Meyer v. Washington Times Co.*, 76 F.2d 988, 990, *cert denied*, 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682 (1935). It is clear from the language employed in the Contract that Amtrak and Adtranz intended that claims for moneys due under the Contract, which would include damages arising out of a breach of contract, are not to be assigned without the written consent of Amtrak. *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1234–35 (10th Cir.1988) (denied expanding the non-assignment clause from the general rule allowing assignments to include a right to damages, because the clause itself did not show a different intent.) Unlike *Touche Ross* the non-assignment clause in the instant case, specifically states that "any moneys due or to become due to [Adtranz]" may not be assigned without the consent of Amtrak.

Neither Adtranz nor Comstock has provided any evidence to indicate that Amtrak approved the assignment. On the contrary, Amtrak vehemently opposes the assignment. Adtranz did not have the right to assign any part of any cause of action related to the Contract without Amtrak's consent. Consequently, the assignment is invalid and Comstock has no authority to pursue this lawsuit. It should be noted, however, that Comstock is not left without remedies. Under the Consortium Agreement with Adtranz, Comstock has the right to pursue recovery from Adtranz for any and all damages it sustains in connection with the Project. Given that Adtranz did not get consent from Amtrak for the assignment, and the assignment is therefore invalid, Amtrak's motion for summary judgment against Comstock must be **granted** and Comstock is hereby **dismissed** as a party from the present lawsuit.[5]

**5.** Since Comstock has been dismissed as a party to this case, all remaining issues shall deal with

## C. Fraud Claims

■ NJT, joined by Amtrak, has filed a motion for summary judgment on Adtranz' fraud claims alleging that Adtranz cannot offer "clear and convincing" evidence with "convincing clarity" for each element of its fraud or conspiracy to defraud claims because both Defendants lacked the knowledge or intent to commit fraud. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hunter–Boykin v. George Washington Univ.*, 132 F.3d 77, 82 (D.C.Cir.1998). Adtranz claims that Con Edison required a limit at the full output level from Sunnyside of the sum of "10 Hz and 110 Hz". The purpose of the limits on harmonic and subharmonic current was to ensure the Project did not cause any interference or disruption to the service Con Edison provided its customers. The basis of Adtranz' fraud claims is that NJT and Amtrak knew, prior to the Contract, of this requirement and that cycloconverters could not meet the requirement.

Further, Adtranz alleges that Amtrak and NJT were aware that the change from cycloconverters to dc-link, a more expensive technology which could satisfy Con Edison's output requirements, went far beyond the budget allotted to the Project by NJT. Thus, according to Adtranz when the Contract between Amtrak and Adtranz was signed, NJT and Amtrak secretly intended to force Adtranz to meet Con Edison's limit of 10 Hz and 110 Hz at full output, which was a level higher than specifically required under the Contract, by fraudulently inducing Adtranz to change to dc-link technology at no additional cost to Defendants.

■ The necessary elements for the fraud claim are: (1) a material misrepresentation (or a material misrepresentation by omission) of a presently existing or past fact; (2) knowledge of the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied on; (4) reliance on the misrepresentation; (5) damage; and (6) in commercial contracts negotiated at

Adtranz as the sole Plaintiff.

arms length, reliance that is objectively reasonable. *Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C.Cir.1997); *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C.1992).

■ The elements of a civil conspiracy to defraud are (1) an agreement or common plan to defraud; (2) an overt act in furtherance of the conspiracy; and (3) injury caused by such overt act. *First Chicago Int'l v. United Exch. Co., Ltd.*, 836 F.2d 1375, 1378 (D.C.Cir.1988); *Wiggins v. Philip Morris, Inc.*, 853 F.Supp. 458, 468 (D.D.C.1994). The D.C. Circuit has recognized that "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Halberstam v. Welch*, 705 F.2d 472, 486 (D.D.C.1983); *See also Mandelkorn v. Patrick*, 359 F.Supp. 692, 697 (D.D.C.1973)("There are inherent difficulties in the pleading of a conspiracy, for by its very nature it involves agreement and questions of intent not accessible to Plaintiff.").

"Courts must be particularly wary of granting summary judgment when, as in plaintiff['s] fraud ... claims, intent is at issue." *Avianca, Inc., et al. v. Corriea, et al.*, 1992 WL 93128 *3 (D.D.C. April 13, 1992). "Cases that turn on the moving party's state of mind are not well-suited for summary judgment." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991). Furthermore, a Court should refrain from deciding a case on a motion for summary judgment when "a reasonable jury could draw divergent inferences that would affect the outcome of the case." *Avianca*, 1992 WL 93128 at *3; *See also Alyeska Pipeline Serv. Co. v. U.S. Environmental Protection Agency*, 856 F.2d 309, 314 (D.C.Cir.1988). Thus, "at the summary judgment stage the judge's function is not himself [sic] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Moreover, "[t]he existence of fraud may be inferred from the evidence", *Merrill Lynch, Pierce, Fenner & Smith v. Sorac, Inc.*, 1992 WL 182268, *3 (D.D.C. July 14, 1992), and direct evidence is not required.

In light of these long-settled legal principles, it is clear that Defendant NJT failed to meet its burden of showing that there are no genuine issues of material facts and that it is entitled to judgment as a matter of law. Indeed, this is a case where the parties vigorously contest every material fact. The following examples are a sampling of the many material facts disputed by the parties.

First, Adtranz alleges that NJT and Amtrak purposefully and knowingly included the wrong specifications in the RFP of the Contract in order to later require Adtranz at the 60% Design Submittal stage to change and pay for the more expensive dc-link technology. Adtranz asserts that the October 1992 Specifications stated Con Edison's required limit and language of "10 Hz and 110 Hz". According to Adtranz, Con Edison insisted that Defendants include the October 1992 Specifications in the Contract. However, Defendants purposefully excluded the October 1992 Specifications from the RFP in order to ensure that Adtranz would provide a 60% Design Submittal that could not satisfy the requirements of the Project. Instead, the RFP included an August 1992 Specification which had been superceded and omitted the necessary language stating Con Edison's requirements for an output limit. Adtranz alleges that prior to the lawsuit neither NJT nor Amtrak told Adtranz that the wrong Specification was included in the RFP. NJT admits that the wrong Specification was included, but denies that inclusion of the August 1992 Specification was done to fraudulently induce Adtranz to agree to change and pay for the dc-link technology. Rather, NJT argues that the inclusion of the August 1992 Specification was simply a mistake.

Whether the August 1992 Specification was included intentionally or by mistake can not be determined on a motion for summary judgment. The question of Defendants' intent and motivation is an issue that turns on the credibility of witnesses. When as here the testimony of a witness goes to "the heart of the case, the jury should be permitted wide latitude to assess his credibility and to draw reasonable inferences." *Avianca*, 1992 WL 93128 at *3.

Second, NJT claims that neither Amtrak nor NJT had the requisite knowledge to commit the alleged fraud. NJT argues that because of the technical complexity of "harmonics" only engineers in the subspecialty field of power systems understood the issues, and that its engineers had neither the necessary "harmonics" expertise to understand the concepts, nor the motive to defraud Adtranz. Thus, Defendants argue that the civil engineers employed by NJT and the electrical engineers employed by Amtrak did not have the requisite knowledge of what Adtranz' cycloconverters could or could not do. According to NJT, Adtranz, by virtue of being the world leader in cycloconverter technology, is the only one that has the expertise to determine whether cycloconverters could meet the specified harmonics limit.

Adtranz raises serious factual questions regarding how much NJT engineers actually understood about harmonics and Con Edison's required limit. Throughout the Project NJT was advised by LSTS, the engineering experts NJT hired. Roger Avery, a former LSTS engineer who was primarily responsible for writing the Performance Specifications in the RFP, has testified that he kept NJT informed regarding the "10 Hz or 110 Hz" limit output. Further, the credibility of Mr. Oscar Sandoval, one of NJT's engineers who was closely involved in the Project, has been challenged through notes he took at numerous Sunnyside meetings he attended as NJT's sole representative and through his own deposition testimony. Whether NJT's engineers and representative understood the issues revolving around the limit output is a question only the trier of fact can decide.

Third, Adtranz alleges that Con Edison objected to the use of cycloconverter technology on the Project and that it made its objection known to Defendants. This issue goes to Defendants' intent when Amtrak signed the Contract agreeing to Adtranz using cycloconverters for the Project. Adtranz supports its allegations by relying on the testimony of Amil Mukhopadhyay, one of Con Edison's engineers who said the use of

dc-link technology was preferred. The parties debate whether this engineer had the authority to speak on behalf of Con Edison and whether his statements were accurate. Again, this is not a question for the Court to decide on a motion for summary judgment, but for the trier of fact.

Finally, with respect to motive, Adtranz argues that because Amtrak and NJT were working within a specific budget which could not be reallocated or increased, the Defendants concocted the scheme of fraudulently inducing Adtranz to pay for the more expensive change in technology. Adtranz argues that Defendants could not and would not pay the additional $10 million it would cost to use dc-link technology. NJT counters that the budget for the Project was not a problem that could not be resolved. There exists material issues in dispute whether NJT was willing and/or able to increase its budget to pay for the more expensive dc-link technology. The evidence raises serious concerns about the veracity of the witnesses relied on by both sides. Given the significant material issues in dispute, this Court is precluded from deciding the fraud claims on a motion for summary judgment. Therefore, NJT's motion with respect to the fraud claims is denied.[6]

▮ NJT has not challenged the sufficiency of the evidence that NJT and Amtrak entered into a joint venture with respect to the Sunnyside Project. Further, the NIA clearly demonstrates that the Defendants are joint venturers. NJT is a joint venturer that was involved in many of the major decisions regarding the Project as well as being a full funder of the Project. As joint venturers the action of one is attributed to the other. Thus, the actions of Amtrak in D.C. are imputed to NJT, and as such, NJT is subject to personal jurisdiction in this forum, as this Court ruled in its Memorandum Opinion of November 3, 1997.

**D. Choice of Law**

▮ NJT argues that even if the Court finds it has personal jurisdiction over NJT,

6. Plaintiff should take no comfort from the Court's ruling. Even though summary judgment has been denied for the reasons stated, the Court believes that Plaintiff's basic fraud case is a weak and unconvincing one that, even when fleshed out with evidence, may well not survive a jury's careful scrutiny under the "clear and convincing" evidentiary standard.

as it has, *supra,* New Jersey law should apply to Plaintiff's claims against NJT. The fact that this Court has personal jurisdiction over NJT does not mean that NJT must also be subject to District of Columbia law if New Jersey's interests are greater than those of the District of Columbia. The law of different states may be applied to different defendants. *Keene Corp. v. Insurance Co. of N. Am.,* 597 F.Supp. 934, 937–41 (D.D.C.1984); *Lombard v. Economic Dev. Admin. of Puerto Rico,* 1995 WL 447651 (S.D.N.Y. July 27, 1995).

### 1. D.C. Governmental Interest Analysis

■■■■ In a diversity action, the forum must apply the choice-of-law principles of the state or jurisdiction in which it sits to determine governing substantive law. *Ekstrom v. Value Health, Inc.,* 68 F.3d 1391, 1394 (D.C.Cir.1995); *Bledsoe v. Crowley,* 849 F.2d 639, 641 (D.C.Cir.1988). Ordinarily, "[t]he law of the forum is presumed to apply unless it is demonstrated that a foreign jurisdiction has a greater interest in the controversy than does the District." *Doe v. Roe,* 841 F.Supp. 444, 446 (D.D.C.1994). The District employs a modified "governmental interest analysis", under "which the court must evaluate the governmental policies underlying the applicable laws and then determine which jurisdiction's policy would be most advanced by having its law applied to the facts in the case." *Long v. Sears Roebuck & Co.,et al.,* 877 F.Supp. 8, 10 (D.D.C.1995); *Doe v. Roe,* 841 F.Supp. at 446; *Hercules,* 566 A.2d at 40; *District of Columbia v. Coleman,* 667 A.2d 811, 816 (D.C.1995). The state with the "most significant relationship" should be the state whose policy would be advanced by the application of the law. *In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333, 342 (D.D.C.1983).

■■■■ The Restatement (Second) of Conflicts § 145 states four considerations which may guide the Court in its choice of law decisions relating to tortious conduct. These factors are:

(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered.

*Id.* at § 145(2); *In re Air Crash Disaster,* 559 F.Supp. at 342; *Doe v. Roe,* 841 F.Supp. at 446; *Long,* 877 F.Supp. at 11. "The most important factors the Court should consider in a tort action are the relevant policies of the forum and of other interested states in the determination of the particular issues." *Long,* 877 F.Supp. at 11.

■■■■ The Court must determine whether there is a genuine conflict between the laws of the involved jurisdiction or whether there is a "false conflict." *Eli Lilly & Co. v. Home Ins. Co.,* 764 F.2d 876, 882 (D.C.Cir.1985), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). A false conflict exists and the law of the interested state prevails "when the policies of one state would be advanced by the application of its laws, and that of another state would not be advanced by application of their law". *Biscoe v. Arlington County,* 738 F.2d 1352, 1360 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985). "A true conflict is presented when both states have an interest in applying their own laws to the underlying facts; in that event, the forum law will be applied unless the foreign state has a greater interest in the controversy." *Kaiser–Georgetown Community Health Plan, Inc. et al. v. Stutsman,* 491 A.2d 502, 509 (D.C.1985) (*quoting Biscoe,* 738 F.2d at 1360).

In the instant case we see that a false conflict exists because the policies of New Jersey would be significantly advanced by the application of its law, whereas the policies of the District are neither advanced nor impacted by the application of District of Columbia law to the claims against NJT.

■■■■ The State of New Jersey has the "most significant relationship" to this litigation for numerous reasons. NJT was expressly created as "an instrumentality of the State [of New Jersey] exercising public and essential governmental functions." N.J. Stat. Ann. § 27:25–4 (West 1992). Under the New Jersey Tort Claims Act ("NJTCA") and the New Jersey Contractual Liabilities Act

("NJCLA"), NJT is a "public entity" and is immune from suit except as expressly permitted under those statutes. N.J. Stat. Ann. §§ 59:13–1 *et seq.* and 59:1–1 *et seq.* Moreover, New Jersey's enactment of the immunity statutes manifests a strong public policy in favor of protecting instrumentalities of the state of New Jersey such as NJT. These immunity laws give New Jersey an overwhelmingly strong interest in having its laws applied to NJT. New Jersey's immunity statutes manifest a clearly articulated public policy regarding limitations on the liability of New Jersey instrumentalities. The legislature deemed that immunity policy necessary to protect the finances of New Jersey's provider of mass transit and New Jersey's tax revenues. Any award of money against NJT would be paid from New Jersey tax dollars and New Jersey would be the most concerned with regulating its instrumentalities.

Adtranz argues that resolution of the choice of law issue is dictated by the clause in the Contract between Amtrak and Adtranz which states that "[a]ny dispute relating to this Contract" is expressly made subject to District of Columbia law. But, NJT is not a party to this Contract. Neither Adtranz nor NJT are domiciled in the District. NJT is a New Jersey corporation, and Adtranz is a Delaware corporation, headquartered in Pennsylvania. None of the injuries Adtranz alleges to have been caused by Defendants' fraud, tortious interference with the Contract, unjust enrichment, or quantum meruit occurred in the District. The Project is not located in the District and provides no benefits to the District or its citizens. Finally, the relationships of the parties is not centered in the District of Columbia. Any benefit derived by NJT will affect New York and New Jersey commuters and travelers. Significantly, District of Columbia residents will neither derive any benefits nor suffer any consequences as a result of the outcome of this case or of the Project. Nor will the strained District of Columbia treasury be affected by the outcome of this case. In short, the District is a disinterested forum, with no "significant relationship" to the litigation.

Adtranz argues that if this Court chooses not to apply the District law, then it should apply New York's law. This argument is not persuasive. Even though the Sunnyside station is located in New York, that is the extent of New York's interest in this case. The issues that predominate in this case, particularly the fraud claims and tortious interference with contract, have nothing to do with the construction of the station, but rather with the bidding for and design of the technology. None of the parties are residents of New York. In sum, the interests of New York citizens are not significantly affected by this litigation and therefore New York law should not be applied.[7]

"Under proper conflicts of law principles, the Court is to conduct the choice of law analysis for each distinct issue being adjudicated", *In re Air Disaster*, 559 F.Supp. at 341. The Court will now turn to that analysis.

### a. Tort Claims

The tort claims against NJT for fraud and tortious interference have no significant relationship to the District of Columbia. Amtrak, the only party that is a D.C. corporation, actually assigned primary responsibility for the Project to its Philadelphia office. With respect to NJT, all of its actions and communications related to the Project flowed from its offices in New Jersey. LSTS, NJT's engineering consultant for the Project, is headquartered in New Jersey and its contract with NJT is governed by New Jersey law. Furthermore, during the time period of 1990–94, the period when Adtranz was seeking, negotiating, and performing the SFCS Contract, Adtranz was authorized to conduct business in New Jersey, had an agent for service of process in New Jersey, had an office (for a short period) in Trenton, New Jersey, and engaged in activities related to the Contract in New Jersey. Thus, with respect to the tort claims, clearly New Jer-

---

**7.** Adtranz argues that if it prevails in the present lawsuit, then Amtrak would seek recovery from NJT in this Court causing duplicative lawsuits. The NIA does not include a choice of forum provision; therefore, any cause of action between Amtrak and NJT would not necessarily occur in this Court. Thus, this Court does not need to concern itself with duplicative law suits.

sey has the "most significant relationship" to this litigation.

### b. Quasi–Contract Claims

With respect to Adtranz' claims against NJT for quantum meruit and unjust enrichment, it is clear that any benefit which might have accrued to NJT would only have occurred in New Jersey, and impacted New Jersey's economy and citizens. The fact that all economic benefits which NJT might have derived from the alleged fraud would inure to New Jersey—not the District—is further support for applying New Jersey law to the quasi-contract claims.

### c. Punitive Damages

Punitive damages are imposed to deter and/or punish conduct. In the instant case, the state with the most significant interest in allowing or disallowing punitive damages is New Jersey because of the District's minimal relationship to the claims and the parties. Moreover, any award of punitive damages would affect New Jersey's public fisc. District of Columbia citizens would not be affected in any way. Therefore, under the governmental interest analysis New Jersey law applies to the punitive damages claim.

### 2. Application of New Jersey Law

#### a. Tort Claims

■■■ NJT argues that the New Jersey Tort Claims Act ("NJTCA") precludes Adtranz' claims for fraud, conspiracy to defraud, and tortious interference against NJT. The Act specifically provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2–10. The Comment to this section states that it adopts the principle enunciated in *O'Connor v. Harms, et al.*, 111 N.J.Super. 22, 266 A.2d 605, 607 (App.Div. 1970) that: "a public corporation, such as a city or other public body, by reason of its being an artificial legal entity created by law to perform limited governmental functions, cannot entertain malice, as a public corporation." [8] Thus, the NJTCA clearly bars

claims for fraud, conspiracy to defraud, and tortious interference.

■■■ Furthermore, even if the Act permitted such claims, Adtranz failed to comply with its strict notice requirement. The Act provides that "[n]o action shall be brought against a public entity under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J. Stat. Ann. § 59:8–3. The Act requires that notice be filed within 90 days of the accrual of the cause of action, and provides for a six-month waiting period before a suit can be initiated. *Id.* at § 59:8–8. The burden of proving that the claim was filed with the appropriate public entity is on the Plaintiff. *Id.* § 59:8–10; *Hammond v. City of Paterson*, 145 N.J.Super. 452, 368 A.2d 373 (App.Div.1976). If a claimant does not file a Notice of Claim within 90 days after the accrual of the cause of action and does not obtain leave to file a late notice from a "judge of the [New Jersey] Superior Court" within one year after accrual, then the claimant "shall be forever barred from recovering against a public entity." *Id.* § 59:8–8.

■■■ Adtranz argues that NJT received its statutory notice because Adtranz "substantially complied" with any applicable notice provision when "notice was communicated to NJT by Amtrak" that Adtranz filed a $12 million claim under the Contract on July 19, 1995. (Adtranz' Opp'n to NJT's Mot. for Summ. J. at 49–50.) Clearly, notice by Amtrak, who is a third party, does not satisfy the very specific requirements of the Act. Direct notice must be provided by the claimant to the public entity within the requisite time period so that the state may investigate and, if appropriate, resolve the dispute. This Adtranz has failed to do. Therefore, NJT's *motion for summary judgment with respect to the tort claims under the NJTCA must be* **granted.**

#### b. Punitive Damages

■■■ The NJTCA also bars claims against NJT for punitive damages. N.J. Stat. Ann.

---

8. The New Jersey Supreme Court has held that such Comments "are given not simply deference but something close to binding effect." *Civalier*

*by Civalier v. Estate of Trancucci*, 138 N.J. 52, 648 A.2d 705, 714 (1994).

§ 59:9–2(c) states: "no punitive or exemplary damages shall be awarded against a public entity." New Jersey courts have uniformly held that this provision bars any punitive damages claims against a public entity for alleged torts. *Thorpe v. Cohen*, 258 N.J.Super. 523, 610 A.2d 878, 881 (App.Div.1992); *Marion v. Borough of Manasquan*, 231 N.J.Super. 320, 555 A.2d 699, 705 (App.Div. 1989). Since the NJTCA applies to NJT as a public entity of the state of New Jersey, this Court must **grant** NJT's motion for summary judgment with respect to punitive damages.

### c. Unjust Enrichment and Quantum Meruit

■ New Jersey has mandated that all contractual relationships involving the state, its agencies and its instrumentalities be governed by the New Jersey Contractual Liability Act ("NJCLA"), N.J. Stat. Ann. § 59:13–1 *et seq.* The NJCLA bars claims for contracts implied in law:

> [T]here shall be no recovery against the State for punitive or consequential damages arising out of contract nor shall there be any recovery against the State for claims based upon implied warranties or upon contracts implied in law.

N.J. Stat. Ann. § 59:13–3. NJT is covered by the protections of the NJCLA. *See* N.J. Stat. Ann. § 27:25:9. Adtranz argues that the NJCLA does not bar its claims for unjust enrichment and quantum meruit because District of Columbia law treats quantum meruit and unjust enrichment claims as contracts in fact and the factual disputes in this case preclude summary judgment. Since New Jersey law is being applied, the District of Columbia's treatment of quantum meruit and unjust enrichment claims as contracts implied in fact is simply irrelevant. What is relevant is that under New Jersey law quantum meruit and unjust enrichment claims are treated as contracts implied in law and not contracts implied in fact, thereby raising legal, not factual issues. *See Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 608 A.2d 280, 285 (1992) (quantum meruit is a type of quasi-contractual recovery); *Wanaque Borough Sewerage Auth. v. Township of West*

*Milford,* 144 N.J. 564, 677 A.2d 747, 751 (1996) (implied in law contract is synonym for quasi-contracts). Consequently, New Jersey law bars unjust enrichment and quantum meruit suits against NJT, and this Court must **grant** NJT's motion for summary judgment with respect to the unjust enrichment and quantum meruit claims under the NJCLA.

### d. New Jersey Common Law

#### (i) Tort claims

■ NJT argues that the New Jersey common law claims should be dismissed for failure to state a claim. NJT argues that its alleged interference with the Contract would be justified or privileged because NJT has a legitimate financial interest in Amtrak's rejection of the 60% Design Submittal and Adtranz' subsequent offer to use the more expensive dc-link technology, which might require extra NJT funding. Additionally, NJT argues that it is authorized to monitor Amtrak's expenditure of New Jersey tax revenues and federal funds received from the FTA. Thus, NJT argues that its actions were done without malice and, therefore, are justified and privileged.

■ To establish a *prima facie* case of tortious interference with contract a plaintiff must allege: (1) the existence of a contract, (2) known to the defendant, (3) who intentionally procures the breach of the contact, and (4) damages resulting from the breach. *Score Board, Inc. v. Upper Deck Co.,* 959 F.Supp. 234, 238 (D.N.J.1997). Obviously, NJT does not dispute the existence of the Contract between Amtrak and Adtranz, nor that it had knowledge of this Contract. The material issue in dispute is whether NJT intentionally procured its breach. As NJT accurately states "[a] claim for tortious interference lies only if the interference was done with 'malice.' " Malice means that "the harm was inflicted intentionally and without justification or excuse." (NJT's Brief at 36) (*quoting Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (1989)).

Central to Adtranz' fraud claim is whether NJT employed wrongful means and acts to

protect its financial interest, which would negate a claim of economic justification. Restatement (Second) of Torts § 769 (cited by NJT in its brief). The parties vigorously contest this issue and, as the Court has already ruled, *supra*, the fraud claims are not amenable to summary judgment. For the same reasons, the New Jersey common law claims for tortious interference with contract must be submitted to a jury. Consequently, NJT's motion for summary judgment with respect to the tort common law claims must be **denied**.

### (ii) Unjust enrichment and quantum meruit claims

NJT argues that summary judgment should be granted against the common law claims of unjust enrichment and quantum meruit because the Contract between Adtranz and Amtrak provides no right to payments by NJT to Adtranz. NJT claims that any right to compensation will be determined by the Contract between Amtrak and Adtranz.

The elements for unjust enrichment are (1) unjust enrichment of Defendant at Plaintiff's expense, (2) where in good conscience Defendant should make restitution. *Callano v. Oakwood Park Homes Corp.*, 91 N.J.Super. 105, 219 A.2d 332, 334 (App.Div. 1966).[9] Similarly, the elements for quantum meruit are (1) Plaintiff rendered valuable services, (2) for the person from whom recovery is sought, (3) which services were accepted and enjoyed by that person, and (4) under all circumstances, the person was aware that plaintiff expected to be paid. *Kopin v. Orange Prod., Inc.*, 297 N.J.Super. 353, 688 A.2d 130, 137 (App.Div.1997).

"A plaintiff is not entitled to employ the legal fiction of quasi-contract to 'substitute one promisor or debtor for another.'" *Callano*, 219 A.2d at 335 (quoting *Cascaden v. Magryta*, 247 Mich. 267, 225 N.W. 511, 512 (1929)). Furthermore, "there must be an objective expectation by defendant to pay plaintiff." *Insulation Contacting and Supply, et al. v. Kravco, Inc., et al.*, 209

N.J.Super. 367, 507 A.2d 754, 760 (App.Div. 1986). Therefore, "[i]f the party conferring a benefit does so pursuant to a contract with a third party, then non-performance by the other party to the contract does not entitle the party conferring the benefit to repayment from the recipient on a theory of ... unjust enrichment." *Id.*

Applying the New Jersey case law to the facts of our case, it is clear that since there is a comprehensive Contract between Adtranz and Amtrak, to which NJT is not a party, Adtranz' claims for unjust enrichment and quantum meruit apply solely to Amtrak. Even though Adtranz knew from the very beginning that NJT would benefit from the Project, the owner of the Project is Amtrak. Adtranz was aware of the benefits the Project would confer on NJT. Significantly, there have been no allegations that Adtranz expected payment from NJT at the time Adtranz entered into the Contract. Additionally, there have been no allegations made that NJT received a benefit intended for Amtrak. Thus, this Court **grants** NJT's motion for summary judgment with respect to the New Jersey common law claims of unjust enrichment and quantum meruit.

### E. Accord and Satisfaction

Amtrak argues that after it rejected Adtranz' 60% Design Submittal for failure to meet the Contract requirements, Amtrak and Adtranz entered into a subsequent valid and binding agreement in which Adtranz agreed to build the Station using dc-link technology at no additional cost to Amtrak. Amtrak claims that it fully performed all terms of this agreement by not issuing a cure notice and terminating the Contract with Adtranz for breach of contract. Consequently, Adtranz cannot accept the benefits of the agreement and now sue for the costs associated with the change in technology. Thus, according to Amtrak, the doctrine of accord and satisfaction bars Adtranz from asserting its claims. Amtrak concedes that there is no written agreement containing the signatures of both parties, but argues that contempora-

---

**9.** Since the Court is applying New Jersey law to the claims against NJT, it will not address Plaintiff's arguments with respect to the law in the District of Columbia regarding quantum meruit and unjust enrichment.

neous correspondence between the parties, Adtranz' internal records, and Adtranz' conduct in changing the technology, support and acknowledge Adtranz' agreement to provide the technology change at no additional cost to Amtrak.

Accord and satisfaction is an affirmative defense. Thus, Amtrak bears the burden of proof, and an agreement is not to be presumed. *Pierola v. Moschonas*, 687 A.2d 942, 947 (D.C.1997). Accord and satisfaction is a "method of discharging and terminating an existing right and constitutes a perfect defense in an action for enforcement of the previous claim." *Id.* (Citing to 6 Arthur L. Corbin, Corbin on Contracts § 1276 (1962)). "[A]ccord and satisfaction requires both a contract, known as the accord, and performance of that contract, known as the satisfaction." *Id.*

The essential elements of a defense of accord and satisfaction are: (1) a legitimately disputed claim or unliquidated claim; (2) a mutual agreement between the parties to accept something other than what is due in satisfaction of the claim; and (3) the giving and taking of the substituted performance. *Stinson v. Mueller*, 449 A.2d 329, 331–32 (D.C.1982). The parties agree that there is a disputed claim between them, the rejection of the 60% Design Submittal. The parties, however, vigorously disagree on whether an agreement was ever reached between them to settle that claim. Both Amtrak and Adtranz submit numerous documents in support of their contentions.

In order to conclude that an accord and satisfaction bars Adtranz from recovery, the Court must have found a pre-existing valid contract. *See Bank–Fund Staff Fed. Credit Union v. Cuellar*, 639 A.2d 561, 575 (D.C.1994); *Goldman v. Bequai*, 19 F.3d 666, 672 (D.C.Cir.1994). "The existence of such an agreement becomes a matter of law only when the facts related thereto are not in dispute." *Barrett v. Air Brakes & Controls, Inc.*, 130 A.2d 310, 311 (D.C.1957). In the instant case, Adtranz argues that because the initial Contract between Amtrak and Adtranz

was fraudulently induced, that Contract is not valid; and therefore, there can not be an accord and satisfaction. As already discussed, these fraud issues must be decided by a jury.

Further, even if the pre-existing Contract is found to be valid, there are material issues in dispute as to whether a subsequent agreement was reached by the parties, thus precluding summary judgment. Adtranz argues that when there is no formal written contract and the parties dispute whether a subsequent agreement was reached, courts consider: (1) whether the contract is one usually put in writing; (2) whether there are few or many details; (3) whether the amount involved is large or small; (4) whether it requires a formal writing for a full expression of the covenants and promises; and (5) whether the negotiations indicate that a written draft is contemplated as the final conclusion of the negotiations. *Novecon, Ltd. v. Bulgarian–American Enter., Fund, et al.*, 967 F.Supp. 1382, 1387 (D.D.C.1997). Adtranz claims that in the instant case, the parties would have put the agreement in writing because there are many details involved and the agreement involved millions of dollars in costs. Furthermore, the correspondence between the parties clearly indicates their intent that the agreement be in writing and signed by both parties.

Amtrak counters that an agreement did exist because Adtranz unequivocally assented to it and in fact followed it by redesigning the Project and performing the change of technology. Amtrak argues that Adtranz' conduct clearly shows that an accord was reached by agreeing to make the change in technology, implementing the change, and not submitting a claim for costs until more than a year after it began implementing the change in technology. *Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995); *Somervell v. Baxter Healthcare Corp.*, 966 F.Supp. 18, 21 (D.D.C.1997). Given the material facts in dispute about whether the pre-existing Contract is valid [10], whether an accord and satisfaction was reached by the parties, and whether the parties ever came to a meeting

---

10. *See* Section III. C., *supra*, denying NJT's motion for summary judgment against Adtranz on

the fraud claims because of material issues in dispute.

of the minds, Amtrak's motion for summary judgment on the theory of accord and satisfaction must be **denied.**[11]

### F. Promissory Estoppel

■■■■ Amtrak further argues that Adtranz is barred from raising any claims against Amtrak under the theory of promissory estoppel. Under that doctrine, a promise is binding and enforceable if (1) the promisor expected or should have reasonably expected that the promisee would induce action of a definite and substantial character on the part of the promisee; (2) the promisee did induce such action; and (3) the circumstances require enforcement of the promise to avoid injustice. *Oates v. Teamster Affiliates Pension Plan,* 482 F.Supp. 481, 488 (D.D.C.1979). As with accord and satisfaction, defendant bears the burden of proof on the affirmative defense of estoppel. *Nolan v. Nolan,* 568 A.2d 479, 483–84 (D.C.1990).

According to Amtrak, Adtranz made repeated promises, representations, and assurances that it would perform the change in technology at no cost to Amtrak. Further, Amtrak relied on those statements to its detriment by foregoing its remedies against Adtranz when Amtrak determined that the 60% Design Submittal would not meet the needed requirements.

■■■■ Amtrak further argues that justice requires that Adtranz be bound by its promise and estopped from raising claims for the costs associated with the change in technology. Amtrak claims that it has suffered damages stemming from approximately two years of project delays as well as related costs incurred as a result of Adtranz' deficient and untimely performance. Moreover, Amtrak argues that the dc-link technology installed is less efficient than the cyclocon-

verters originally proposed, and therefore Amtrak is incurring greater operating costs in the form of power purchase costs. Finally, Adtranz failed to complete the Project within the agreed upon performance period, causing Amtrak to suffer additional millions of dollars in damages.

Adtranz counters that Amtrak could not have reasonably relied on its promise to change the technology at no additional cost, because its promise was conditioned on relief on so-called commercial issues which were material to the resolution of the dispute. These commercial issues included schedule penalties, line losses, and thyristor redundancy. Since Amtrak never agreed on the commercial issues, Adtranz argues that Amtrak could not rely on Adtranz' promise to the change of technology at no additional cost. Whether the commercial issues were material to Adtranz' promise to change the technology at no additional cost is a material issue of fact in dispute by the parties. Therefore, Amtrak's motion for summary judgment with respect to promissory estoppel must be **denied.**

### G. Adtranz Damages Claims

#### 1. Expenses incurred with respect to high speed trains

■■■ Adtranz asserts a claim for the costs it incurred in connection with an unrelated Equipment Test and Demonstration Agreement (the "Testing Agreement") and its unsuccessful proposal to supply Amtrak with a high speed train system. Amtrak and Adtranz entered into the Testing Agreement on April 10, 1992, agreeing to the testing and demonstration of a "X–2000" high speed train. The X–2000 train was brought to the United States and later returned to Sweden in 1993, long before Amtrak issued its Sep-

---

11. *Adtranz not only opposes the motion for summary judgment on the theory of accord and satisfaction, but it also asserts that the Court should grant summary judgment sua sponte in its favor and find that no post-contract agreement was reached. Adtranz cites to Celotex, 477 U.S. at 326, 106 S.Ct. 2548, for the proposition that "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her*

*evidence." Adtranz further argues that "summary judgment may be rendered in favor of [the non-moving] party even though [that party] has made no formal cross-motion under Rule 56." Leahy v. District of Columbia, 833 F.2d 1046, 1047 (D.C.Cir.1987). Given the material facts in dispute as to whether an accord was reached, even assuming the original contract was not fraudulently induced, the Court denies Adtranz' request for summary judgment.*

tember 6, 1994 Request for Proposal for the high speed train project.

The parties performed their obligations under the Testing Agreement, and in September 1994, Amtrak issued its high speed train Request for Proposals, soliciting proposals for the design and production of a number of high speed trains. Adtranz and two other vendors submitted proposals. Adtranz submitted two proposals and was viewed by Amtrak as competitive with the other bidders. However, when Adtranz submitted its best and final offer, the price had increased by approximately $100,000,000 or 25% from the previous proposal. On December 27, 1995, Adtranz was informed that it was no longer being considered for the high speed train contract.

Adtranz argues that the costs it incurred with the high speed train contract are part of the damages it suffered as a result of Amtrak's and NJT's conspiracy to defraud it. Adtranz argues that NJT and Amtrak used the high speed train project to coerce Adtranz into agreeing to the dc-link technology change at no additional cost.

Adtranz' arguments are totally unconvincing. First, these are two separate projects governed by separate agreements. The high speed train project is governed by the April 1992, Testing Agreement and Amtrak's September 1994 Request for Proposal for the High Speed Rail Project. The Contract at issue in the current lawsuit is governed by a separate agreement entered into by Adtranz and Amtrak in November 1993. Adtranz cannot now attempt to recover the costs it incurred in connection with the Testing Agreement solely because it was not awarded the high speed train contract. The high speed train project and the Sunnyside project are two entirely separate commercial ventures.

Second, Adtranz is not entitled to any damages as a result of the high speed train project as a matter of law because Adtranz is unable to demonstrate any factual relationship between the high speed train agreement and the change in technology. None of the evidence offered by Adtranz shows that Amtrak acted unlawfully in deciding not to award Adtranz the high speed train contract.

Furthermore, Amtrak provided full justification for its refusal to award Adtranz the high speed train contract. David Carol, Amtrak's Vice President of High–Speed Rail and the person responsible for reviewing the various high speed train proposals testified that Adtranz was eliminated as a bidder because its price increased by one hundred million dollars or 25% at its best and final offer. (Amtrak's Mot. for Summ. J. against Adtranz, Ex. SS, Carol Tr., Vol. 1, pp. 18, 31–34; Ex. F., Metz Tr., Vol. 3, p. 903.) Adtranz does not contest this statement. Adtranz' witnesses merely speculate as to why they think negotiations with Adtranz were terminated. None offer conclusive evidence contrary to Amtrak's evidence.

Adtranz has had more than two years within which to present evidence to support its claim, and it has not offered a shred of evidence to dispute Amtrak's assertions. Finally, Amtrak could reasonably rely on the difficulties it was having with Adtranz on the Sunnyside Project to determine whether to offer Adtranz future business. Thus, Amtrak's motion for summary judgment with respect to the costs with the high speed train project is granted.

## 2. Production costs related to Sunnyside Project and Punitive Damages

 Amtrak argues that Adtranz is not entitled to the damages asserted in its Complaint because (1) the costs were not incurred by and are not the responsibility of Adtranz;[12] (2) Adtranz is unable to carry its burden with regard to the elements necessary to sustain a damage award based on the total cost method of calculating damages[13]; (3) Adtranz' damages for changes in the

---

**12.** This issue was decided in Section III, A., *supra*.

**13.** Elements of the total cost method are: (1) the nature of the losses makes it impossible or highly impracticable to determine the contractor's actual losses with a reasonable degree of accuracy; (2) the contractor's bid was realistic; (3) the contractor's actual costs were reasonable; and (4) the contractor is not responsible for the additional expenses. *Youngdale & Sons Const. Co., Inc. v. U.S.*, 27 Fed. Cl. 516, 541 (1993).

scope of work are limited and defined by the Contract between Adtranz and Amtrak; (4) the damages asserted are not reasonably foreseeable; and (5) punitive damages are not recoverable for the breach of contract alleged.

Summary judgment on the damages claims is not appropriate for several reasons. First, the parties present conflicting evidence as to which cost method of calculating damages was used. For example, Adtranz alleges it used an "actual cost" method, which is preferred by the courts, rather than the "total cost" method Amtrak alleges it used. *New Pueblo Constructors v. Arizona,* 144 Ariz. 95, 696 P.2d 185, 194 (1985). Second, the parties do not provide adequate evidence from which the Court could determine which method was used to calculate Adtranz' damages. Third, with respect to the claim for punitive damages, the Court will reserve ruling until after all the evidence is presented. Thus, the Court **denies** Amtrak's motion for summary judgment with respect to the damages claims related to the Sunnyside Project.

## IV. *Conclusion*

For the reasons discussed above, the Court concludes that:

(1) New Jersey Transit's Motion for Summary Judgment is **denied in part and granted in part** as follows: (a) **denied** with respect to the fraud claims; (b) **granted** with respect to the application of New Jersey law to all claims against New Jersey Transit; (c) **granted** with respect to tort claims and punitive damages claims under the New Jersey Tort Claims Act; (d) **granted** with respect to unjust enrichment and quantum meruit claims under the New Jersey Contractual Liabilities Act; (e) **granted** with respect to unjust enrichment and quantum meruit claims under New Jersey common law; and (f) **denied** with respect to tort claims under New Jersey common law;

(2) Amtrak's Motion for Summary Judgment Against Adtranz is **denied in part and granted in part** as follows: (a) **denied** with respect to Rule 17(a); (b) **denied** with respect to the fraud claims; (c) **denied** with respect to accord and satisfaction; (d) **denied** with respect to promissory estoppel; (e)

**granted** with respect to damages on high speed train project; and (f) **denied** with respect to all damages and costs regarding the Sunnyside Project; and

(3) Amtrak's Motion for Summary Judgment Against Comstock is **granted.**

### *ORDER*

This matter is before the Court on Defendant New Jersey Transit Corporation's Motion for Summary Judgment And Partial Summary Judgment On All Claims of Adtranz and Comstock pursuant to Fed. R.Civ.P. 56(b) [# 219], Defendant Amtrak's Motion for Summary Judgment Against Adtranz pursuant to Fed.R.Civ.P. 56(b) [# 217], and Defendant Amtrak's Motion for Summary Judgment Against L.K. Comstock & Co. pursuant to Fed.R.Civ.P. 56(b) [# 218].

Having considered the Motions, Oppositions, Replies, the four and a half hour oral argument, voluminous pleadings, and the entire record, for the reasons set forth in the accompanying Memorandum Opinion, it is this 8th day of June 1998, hereby

**ORDERED,** that New Jersey Transit's Motion for Summary Judgment is **denied in part and granted in part** as follows: (a) **denied** with respect to the fraud claims; (b) **granted** with respect to the application of New Jersey law to all claims against New Jersey Transit; (c) **granted** with respect to tort claims and punitive damages claims under the New Jersey Tort Claims Act; (d) **granted** with respect to unjust enrichment and quantum meruit claims under the New Jersey Contractual Liabilities Act; (e) **granted** with respect to unjust enrichment and quantum meruit claims under New Jersey common law; and (f) **denied** with respect to tort claims under New Jersey common law; it is further

**ORDERED,** that Amtrak's Motion for Summary Judgment Against Adtranz is **denied in part and granted in part** as follows: (a) denied with respect to Rule 17(a); (b) **denied** with respect to the fraud claims; (c) **denied** with respect to accord and satisfaction; (d) **denied** with respect to promissory estoppel; (e) **granted** with respect to damages on high speed train project; and (f)

**denied** with respect to all damages and costs regarding the Sunnyside Project; and it is further

**ORDERED,** that Amtrak's Motion for Summary Judgment Against Comstock is **granted.**